In re Charles M. **RICHARDSON** and Rebecca M. **Richardson,** Debtors.

**CORESTATES BANK OF DELAWARE, N.A., Plaintiff,**

v.

**Charles M. RICHARDSON, Defendant.**

Bankruptcy No. 94–70305.
Adv. No. 94–8076.

United States Bankruptcy Court,
D. South Carolina.

Oct. 21, 1994.

Angela L. Henry, Columbia, SC, for Corestates Bank of Delaware, N.A.

Lawrence Keitt, Orangeburg, SC, for Charles M. Richardson.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the court upon an adversarial proceeding filed by Corestates Bank of Delaware, N.A. ("Corestates") seeking to have a $5,820.48 debt owed to it by one of the joint debtors, Charles M. Richardson ("Charles Richardson"), excepted from discharge pursuant to 11 U.S.C.[1] Section 523(a)(2)(A).[2]

A hearing on the matter was held on September 20, 1994 at which time the parties to the adversarial proceeding were represented by counsel.

In this action, Corestates takes the position that the debtors were unemployed when the charges on the credit card were made and therefore there was no realistic expectation or reasonable ability of paying the debt and therefore the debt should be determined to be non-dischargeable.

The defendant Charles Richardson disputes that he personally incurred this debt to Corestates and additionally denies that such obligation arose as a result of "false pretenses, a false representation or actual fraud" as required under Section 523(a)(2)(A).

After careful consideration of the evidence; consisting of the debtor's tax returns for 1991 and 1992, deposit slips with National Westminister Bank of New Jersey in the amount of $1401.79, various check stubs, the joint Chapter 7 Petition, Schedules and

---

1. Further references to the Bankruptcy Code (11 U.S.C. Section 101, et seq.) shall be by section number only.

2. Section 523(a)(2)(A) provides:
   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Statements and the testimony of the sole witnesses, Charles and Rebecca Richardson, the Court makes the following Statement of Facts and Conclusions of Law.

## STATEMENT OF FACTS

1. Charles Richardson, after a twenty-four (24) year employment history with a banking institution, resigned his position as Assistant Vice President in June of 1991 to start a bookstore business with his wife, Rebecca M. Richardson ("Rebecca Richardson")[3]. Rebecca Richardson, with a nineteen (19) year employment history also in the financial and banking field, also resigned a position as supervisor of government securities for a large bank in order to join her husband in the bookstore business.

2. In June of 1991, Charles and Rebecca Richardson opened a bookstore business called the Wisdom Christian Store in Sayreville, New Jersey.

3. The debtors' joint income for the year of 1991 was approximately $132,000.00.

4. The debtors' joint income for the year of 1992 was a loss of approximately $40,000.00.

5. Charles Richardson suffered from depression and was hospitalized from April of 1993 until January of 1994.

6. In April of 1993, during the time of her husband's hospitalization and after receiving several "pre-approved" credit card applications addressed to her husband in the mail from Corestates over a period of six (6) months, Rebecca Richardson returned an executed application and received a credit card from Corestates with a $6,500.00 credit limit, account number 1021448–3.[4]

7. A credit card was issued by Corestates in the name of Charles Richardson.

8. Due to his hospitalization; Charles Richardson was without knowledge of the existence of the credit card or of the subsequent charges and cash advances attributable to the card.

9. When Rebecca Richardson returned the application for the credit card, she did not expect that her husband would remain in the hospital for as long as he did.

10. The bookstore business was weak in the summer of 1993 but books were sold through August of 1993 and Rebecca Richardson, the sole manager of the store at that time, retained an expectation that the business would improve.

11. The credit card was first used on August 23, 1994 when Rebecca Richardson obtained a $1,000.00 cash advance.

12. The next charge was on September 4, 1993, when Rebecca Richardson, while visiting her husband in the hospital in West Virginia, used the card to pay for their dinner in the amount of $42.19 at the Stone Crab Inn.

13. The third use of the card by Rebecca Richardson occurred on September 30, 1993, when she obtained a $3,000.00 cash advance against the credit card.

14. The fourth and fifth uses of the card were a $775.42 charge to Budget Car Rental on October 19, 1993 and an $800.00 cash advance on October 27, 1993.

15. All charges and cash advances were used for general living expenses and the moving expenses associated with Rebecca Richardson's move to South Carolina in October of 1993.

16. The bookstore business ceased operations at the end of September of 1993, but continued to receive outstanding accounts receivables. Receipts from the bookstore business were used to pay the bills of both the business and the Richardsons personally.

17. The bookstore business was subsequently sold and the proceeds were used to pay some of the bills of the debtors and the store.

---

**3.** The Court notes that Rebecca M. Richardson is a joint debtor with Charles M. Richardson in the within Chapter 7 proceeding but was not made a party defendant to this adversarial proceeding.

**4.** No party produced or submitted into evidence the credit card application or documentation related thereto.

18. In 1993, the bookstore business did not produce enough income for the debtors to maintain their 1991 standard of living but produced sufficient cash flow to pay towards the Richardson's bills, including credit card bills.

19. On October 20, 1993, Rebecca Richardson moved to South Carolina to take care of her father who had suffered a stroke, a brother with a terminal illness, and a sister who had a baby in September of 1993. The move was also based upon an expectation of lower cost of living expenses in South Carolina.

20. Rebecca Richardson made two payments on the Corestates' debt; one on October 6, 1993 in the amount of $21.00, the minimum payment requested at that time, and one on November 1, 1993 in the amount of $85.00. There were also payments subsequent to September 30, 1993 on other credit card debts.

21. Rebecca Richardson believed that she would find employment in South Carolina and had the intention to pay the Corestates account balance.

22. The $85.00 payment to the account on November 1, 1993 was the last transaction related to the Corestates' credit card.

23. Rebecca Richardson first consulted an attorney about the possibility of filing for bankruptcy protection in late December of 1993.

24. Charles Richardson and Rebecca Richardson filed a joint Chapter 7 bankruptcy petition on January 20, 1994.

25. At the time of the filing of the Chapter 7 petition, both debtors were unemployed with expenses of $460.00 per month.

26. The Chapter 7 Schedules and Statements list $130,000.00 in secured claims representing a residence in New Jersey valued at $125,000.00 and an automobile claim of $5,000.00. The debt on the automobile was to be reaffirmed and the debtor's interest in the house was abandoned. Additionally, the debtors scheduled $9,810.24 in unsecured priority claims and $36,403.27 of unsecured non-priority claims with approximately $26,000.00 of the unsecured non-priority claims comprised of various credit card debts. The majority of the remaining unsecured non-priority claims were comprised of publishing company and medical debts.

27. During their lives, Charles and Rebecca Richardson held numerous credit cards, some for a period of nineteen (19) or twenty (20) years.

28. After being released from the hospital in January of 1994, Charles Richardson joined his wife in South Carolina.

29. After seeking employment in several fields after the move to South Carolina, Rebecca Richardson eventually gained employment in Orangeburg, South Carolina in February of 1994 and is netting approximately $225.00 per week at a factory.

30. Charles Richardson gained employment in Orangeburg, South Carolina in April of 1994.

31. Charles and Rebecca Richardson have resided with her father and two brothers in her father's home since the move to South Carolina.

## CONCLUSIONS OF LAW

■ The party challenging the dischargeability of a debt bears the burden of proof. *Robb v. Robb (In re Robb)*, 23 F.3d 895 (4th Cir.1994); *Stone v. Stone (In re Stone)*, 11 B.R. 209, 211 (Bankr.D.S.C.1981).

■ The Supreme Court has held that the burden of proof under any exception to discharge under Section 523 is the "ordinary preponderance of the evidence." *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).[5] Corestates therefore bears the burden of proving by a preponderance of the evidence the following elements:

1. That the debtor/defendant made a representation;

---

**5.** There is no evidence of any transactions between the parties within forty days of the filing of the Chapter 7 Plan and therefore the Court does not address the presumptions of non-dischargeability as enumerated in Section 523(a)(2)(C).

2. that at the time made, the debtor/defendant knew that the representation was false;

3. that the representation was made by the debtor/defendant with the intention and purpose of deceiving the creditor;

4. that the creditor relied on such representation; and

5. that the creditor sustaining the alleged loss and damage as a result of the representation having been made.

*Southern Road Builders Inc. v. Walter, (In re Walter),* 90–00982, C–90–8154 (Bankr. D.S.C. 5/8/91) citing *In re Bosselait,* 63 B.R. 452 (Bankr.E.D.Va.1986); *In re Wyatt,* 87 B.R. 874 (Bankr.E.D.Va.1988) and *In re Taylor,* 58 B.R. 849 (Bankr.E.D.Va.1986).

■ Although not binding as precedent, in a 1991 unpublished opinion, the Fourth Circuit Court of Appeals supplies guidance on the criteria this Court should use in interpreting this standard. The Court stated that a plaintiff "must show that the debtor made misrepresentations with the intention and purpose of deceiving or defrauding the creditor, that the creditor relied on the misrepresentations and that it sustained a loss as a proximate result of the misrepresentations or fraud." *Chevy Chase F.S.B. v. Hoffman (In re Hoffman)* [6], 934 F.2d 318 (4th Cir.1991) (unpublished) citing *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967) and *In re Basham,* 106 B.R. 453, 457 (Bankr. E.D.Va.1989).

The first element that the plaintiff must prove is that the debtor/defendant Charles Richardson made a representation. Several courts have recognized that the mere use of a credit card can be an implied representation to the issuer that the debtor has the ability and intention to pay for purchases. *In re Rodriguez,* 138 B.R. 112 (Bankr.S.D.Fl.1992); *In re Stewart,* 91 B.R. 489, 494 (Bankr. S.D.Iowa 1988). However, in the within proceeding, there is no evidence that the defendant Charles Richardson applied for the credit card, used the credit card or even

knew of its existence prior to the filing of the bankruptcy.[7] All transactions occurred with the defendants wife, who is not a party to this adversarial proceeding.

While the defendant admitted in discovery that he authorized the use of the credit card to another to make purchases or receive cash advances and make other credit transactions, his testimony is clear that he, being hospitalized, had no actual knowledge of the use or even the existence of the credit card. Therefore there is a question of whether the defendants conduct constituted any actual misrepresentation on which Corestates could rely.

Even if this Court were to find that Rebecca Richardson's actions were imputable to the defendant so that her use of the credit card and any resulting implied representation would be the same as the defendant making the representations himself, the plaintiff would have to next prove that the representation was false and made with the intention and purpose of deceiving the creditor. "[I]mplying a representation of ability to pay does not imply fraud because intent to deceive must still be shown." *In re Weiss,* 139 B.R. 928 (Bankrtcy.D.S.D.1992) citing *In re Schmidt,* 36 B.R. 459 (D.E.D.Mo.1983).

Clearly, if the defendant had no actual knowledge of the existence or use of the credit card, there is again a question of whether he could have had the requisite intent to deceive which is necessary to sustain a denial of dischargeability against him.

Other courts have set forth various elements to be considered in the determination of a debtor's intent. These criteria include the following:

1. the length of time between the charges and bankruptcy petition;

2. the number of charges made;

3. the amount of the charges;

4. whether charges were above credit limit on account;

5. whether there exists a sharp change in the debtor's buying habits;

---

6. Although unpublished Fourth Circuit opinions are not binding precedent (I.O.P. 36.5 and 36.6), they may supply "helpful guidance". *In re Serra Builders, Inc.,* 970 F.2d 1309, 1311 (4th Cir. 1992).

7. No evidence of misrepresentation at the time of the application of the credit card was presented.

6. whether the charges were made in multiples of three or four per day;

7. whether the charges were below the $50 floor limit;

8. whether the debtor was hopelessly insolvent at the time the charges were made;

9. whether an attorney had been consulted about bankruptcy before charges were made;

10. the debtor's employment circumstances;

11. the debtor's prospects for employment; and

12. whether the purchases were made for luxuries or necessities.

*In re Weiss,* 139 B.R. 928, 930 (Bkrtcy.D.S.D. 1992), *In re Kramer,* 38 B.R. 80, 83 (Bankr. W.D.La.1984); *In re Hadley,* 25 B.R. 713 (Bankr.M.D.Fla.1982); *In re Smith,* 25 B.R. 396 (Bankr.D.Md.1982) and *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988).

Looking to all of the surrounding circumstances, this Court is free to find subjective intent to defraud. *In re Weiss,* supra at 930. Additionally, the debtor's demeanor can be taken into account to find an intent to defraud. *In re Sharp,* 144 B.R. 372 (Bkrtcy. S.D.Ohio 1992). In this case, the charges were not made by the defendant but were made by the defendant's wife and were incurred during a period wherein the defendant had become hospitalized, the debtor's business was beginning to experience financial difficulties and the debtors were moving from New Jersey to South Carolina to take care of ill family members and to seek new employment.

The credit card was used on five (5) occasions over a two month period between August 23, 1993 and October 27, 1993. There were three cash advances pursuant to the card and, while in significant sums, all of these advances were well below the credit card limits. At no time during the use of the card did the debtors exceed their credit limit. There were no signs of extravagant or luxurious spending or sharp changes in the debtor's buying habits. Additionally, there were two payments made on the debt as well as payments to the debtors' other credit cards.

The final transaction between these parties was a credit to the account by the debtors over two (2) months before the filing of the bankruptcy petition. The credit card was not repeatedly used on the same day and there was only one charge under $50.00. All of the charges were well before the consultation with an attorney about filing for bankruptcy protection.

As to the debtor's insolvency, the testimony of the debtors was that the bookstore business did not produce enough income for the debtors to maintain their 1991 standard of living but did produce sufficient cash flow to pay their bills. Rebecca Richardson testified that the bookstore business could have remained open but was closed because of the move to South Carolina which was done for family reasons. Even though the debtors' store was closed at the end of September of 1993, the debtors continued to receive payments on outstanding business debts in October of 1993. Additionally, Rebecca Richardson was moving to an area with lower living expenses and planned to reside with relatives until she was rejoined by her husband, whose time of release from the hospital was unknown.

Prior to the bankruptcy, the debtors had a history of successful management of credit cards and there was no evidence presented that the Plaintiff revoked the credit card prior to the bankruptcy filing. "... [I]t is important to remember that there is an inherent element of risk assumed by any issuing bank, which remains until the card is revoked and the revocation is made known to the cardholder or until such time as the cardholder knows that the line of credit has been exceeded." *In re Weiss,* supra at 930.

While this Court has held that "a credit card purchase made with knowledge by the purchaser of his inability or obvious lack of intent to pay is tantamount to obtaining property through false pretenses"[8], in this case, the plaintiff Corestates has failed to meet its burden of establishing the defendant's knowledge of the inability to pay or lack of intent to pay. At the hearing, Cores-

---

**8.** *South Carolina National Bank v. Joan M. Bolling (In re Bolling),* 88–00134, 88–0106 (Bankr. D.S.C. 9/20/88) (WTB) citing *In re LaBuda,* 37 B.R. 47 (Bankr.M.D.Fla.1984) at 48.

tates cites to this Court and relies upon the *Vermillion* decision of the United States Bankruptcy Court for the Western District of Missouri, *In re Vermillion*, 136 B.R. 225 (Bkrtcy.W.D.Mo., 1992).

 The conduct of the debtor in the *Vermillion* case is distinguishable from the within conduct of the debtors. In *Vermillion*, the debtor was using the credit card, at least in part, for gambling expenses and made no payments on the debt. The facts of the within proceeding show that the few uses of the card by Rebecca Richardson were for living and moving expenses. The *Vermillion* court further states that "[w]hat counts is whether the debtor made the representations of his ability to pay, without reasonable belief that he could repay, in order to deceive the creditor, and thereby inducing the extension of credit." *Supra* at p. 227. In addition to the continuing income the debtors received from the bookstore in September and October of 1993, the months of the charges in issue, the testimony of Rebecca Richardson was that she also retained an expectation of obtaining other gainful employment upon her arrival in South Carolina and that she intended to use part of her new salary to satisfy this and other debts. The Court finds this testimony credible. The evidence indicated that the debtors had a proven prior substantive earning capacity with work skills and experiences transferable to a new position in other geographical areas. While the debtors were not immediately able to obtain gainful employment in the banking field, Rebecca Richardson did pursue such employment. This Court finds the debtors expectation for new employment to have been reasonable under the circumstances. This expectation of new employment is a factor to be considered in a determination of the intent of the debtor. *In re Friend*, 156 B.R. 257 (Bkrtcy. W.D.Mo.1993) and *In re Matz*, 136 B.R. 128 (W.D.Mich.1991).

Since the plaintiff Corestates has failed to establish the defendant's intention to deceive the creditor, it is not necessary for the Court to address the remaining elements necessary to except this debt from discharge.

## CONCLUSION

The plaintiff Corestates has failed to prove by a preponderance of the evidence that the defendant, Charles Richardson, obtained money and an extension of credit by false pretenses pursuant to the provisions of Section 523(a)(2)(A). This burden has not been met whether or not the use of the credit card by Rebecca Richardson is imputable to the defendant.

Without prior knowledge of the defendant's hospitalization or of the debtors expectations of employment, Corestates was sufficiently justified in bringing this action so that the defendant is not entitled to an award of attorney's fees and cost pursuant to 11 U.S.C. Section 523(d):

For the reasons stated within, it is therefore

**ORDERED,** that the debtors indebtedness to Corestates Bank of Delaware, N.A. is a debt which is dischargeable pursuant to the provisions of the United States Bankruptcy Code, with the plaintiff and the defendant baring their own costs in this matter.

**AND IT IS SO ORDERED.**