In re TEAM MOTORSPORTS, INC., aka Sports Car Specialty, Debtor,

and

In re Greg GODBOUT, individually and dba Team Motorsports, Inc., Debtor,

FIRST CARD SERVICES, INC., Plaintiff,

v.

TEAM MOTORSPORTS, INC., aka Sports Car Specialty, and Greg Godbout, individually and dba Team Motorsports, Inc., Defendant.

Bankruptcy Nos. 97–00236 B, 97–00285 B. Adversary No. 97–80132.

United States Bankruptcy Court, D. South Carolina.

Dec. 7, 1998.

Beattie B. Ashmore, Ashmore & Yarborough, P.A., Greenville, SC, for Debtors.

Judson K. Chapin, III, Gaines, Walsh & Chapin, Spartanburg, SC, for Creditor.

## AMENDED ORDER

WM. THURMOND BISHOP, Bankruptcy Judge.

This court on its own modifies its Order of December 16, 1997, to clarify and correct technical errors which have resulted from Plaintiff's adversary action against an individual Debtor and a related corporate Debtor regarding the dischargeability of a debt. Plaintiff brought this adversary action against these two defendants anticipating that the defendants' motion to consolidate their bankruptcy cases would in fact be granted.

This is an action brought under 11 U.S.C. § 523(a)(2)(A) to except from discharge a debt on a credit card (the Credit Card) owed

to the Plaintiff by the Debtor[1]. This Court has jurisdiction over this proceeding pursuant to *28 U.S.C. Section 1334, 28 U.S.C. Section 157 and 11 U.S.C. § 523(a)(2)(A) and § 523(c)(1)*. This is an action arising in or related to the bankruptcy cases. This is a core proceeding.

Although most of the relevant evidence was set forth in the stipulations contained in the parties' joint pretrial order, this Court took testimony and received evidence to determine the ultimate issue before the Court of whether the Debtor, in October of 1996, had a present intent to repay advances[2] on his credit card when he drew $9,700.00 in cash advances and in the subsequent months when he drew additional cash.

## FINDINGS OF FACT

1. The Debtor has been in business for over twenty years restoring and reselling expensive sports cars. For most of that time up to October, 1994, the Debtor did reasonably well and the business generated profits.

2. In October, 1994, the Debtor suffered a devastating fire at the business location. The fire destroyed the Debtor's buildings, tools and inventory of expensive care being restored for his customers. The Debtor and his insurance company disputed numerous issues regarding the fire, and the Debtor's fire insurance claim was not paid for nearly a year after the fire. When the claim was paid it was far less than the Debtor felt he was owed and the insurance proceeds were held in escrow by the Debtor's mortgagee to be used exclusively for the reconstruction of the Debtor's building. The Debtor commenced litigation against his insurance company for a bad faith settlement of the claim. That litigation was still pending as of the date of the trial in this case.

3. The interruption of the Debtor's business caused by the fire, the loss of the Debtor's tools, and the loss of the Debtor's inventory of expensive cars for restoration, left the Debtor with virtually no income during the period following the fire. The Debtor testified that after the fire he was effectively living on credit cards.

4. In or about June, 1993, over a year before the fire and at a time when the Debtor's business was reasonably prosperous, the Debtor responded to a solicitation by the Plaintiff for the Credit Card.

5. On the basis of that response and the Plaintiff's pre-approval credit check, the Plaintiff issued the Credit Card to the Debtor with a credit limit of $10,000.00. The Debtor accepted the Credit Card and, during the period from that acceptance through August, 1996, the Debtor used it for credit purchases and cash advances and the Debtor made payments on the Credit Card in accordance with the credit contract.

6. In late August of 1996, the Debtor refinanced his residence. As a condition to that refinancing the Debtor's lender required that the Debtor use a portion of the proceeds of that refinancing to reduce his consumer debt load. Therefore, on September 26, 1996, the Debtor paid, among other things, $8,932.27 on the outstanding balance on the Credit Card reducing that balance to nearly zero.

7. In connection with that refinancing, the Debtor on advice of counsel and for the express purpose of removing his residence from the reach of his creditors, also transferred his interest in the residence to his non-debtor spouse.

8. At the time of the transfer, the residence had an appraised value of $138,000.00 with liens totalling $115,000.00, leaving a value of some $23,000.00 that would otherwise have been available for the Debtor's creditors.

9. On October 1, 1996, the Debtor drew $8,000.00 on the Credit Card and deposited

---

1. For purposes of this action and by joint stipulation of the parties the term "Debtor" refers to both the individual debtor Greg Godbout, in case number 97–00285 and the corporate debtor Team Motorsports, Inc., in case number 97–00236. For convenience the masculine pronoun will be used to refer collectively to both entities.

2. The parties stipulated in their joint pretrial order and on the record at the commencement of the trial of this case that this is the sole element required to be proven by the plaintiff in order for it to prevail.

that money into his personal checking account at Woodruff State Bank.

10. On October 4, 1996, the Debtor drew $1,700.00 on the Credit Card and deposited that money to the account of Team Motorsports, Inc. Later, the Debtor charged an additional $295.94 on the Credit Card and took an additional cash advance of $225.00 on the Credit Card which, together with accruing and unpaid interest charges, caused his balance to exceed his credit limit of $10,000.00 by $573.37.

11. Although the Debtor had, prior to August of 1996, been performing his obligations under the Credit Card agreement by making at least his minimum monthly payments, after the refinancing and transfer of his residence the Debtor never made another payment on the Credit Card.

12. In January, 1997, less than four months after disposing of his single largest personal asset and after drawing down more than the maximum amount of credit available on the Credit Card, the Debtor filed his petitions for relief under Chapter 11 of the Bankruptcy Code.

## DISCUSSION

In this proceeding the Bankruptcy Judge, sitting without a jury, is both the judge of the law and the finder of the facts. As such the Bankruptcy Judge has both the authority and the obligation to determine the weight and credibility of the testimony and other evidence presented and from that determination make his own findings of the ultimate facts.

Section 523(a)(2)(A) excepts from discharge any debt for money, property, or services "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." This exception furthers the policy that an honest but unfortunate debtor obtain a fresh start but a dishonest debtor should not benefit from his wrongdoing. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); *In re Eashai,* 87 F.3d 1082 (9th Cir.1996).

The objecting creditor bears the burden of proving the nondischargeability of the debt under § 523. *Robb v. Robb (In re Robb),* 23 F.3d 895 (4th Cir.1994); *In re Richardson* 179 B.R. 791 (Bankr.D.S.C.1994). The objecting creditor must prove its claim to deny a discharge under § 523 by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 279, 111 S.Ct. 654.

The majority of the Courts, including South Carolina, generally apply the traditional elements of fraud to sustain an action under § 523(a)(2)(A). *In re Richardson,* 179 B.R. 791 (Bankr.D.S.C.1994). These elements are as follows:

1. that the debtor made a representation;
2. that at the time he knew the representation was false;
3. that he made it with the intention and purpose of deceiving the creditor;
4. that the creditor relied on such representation; and
5. that the creditor sustained the alleged loss and damage as the proximate result of the representation.

The parties in the present action have agreed that the only issue before the Court is the intent of the Debtor when the charges were incurred.

Three theories have emerged in applying the above elements to dischargeability actions involving credit cards: (1) the "implied representation" theory, (2) the "assumption of the risk" theory, and (3) the "totality of the circumstances" theory. Most of the courts in the Fourth Circuit, including South Carolina, have adopted the "totality of the circumstances" theory. *In re Richardson,* 179 B.R. at 791; *In re Valdes,* 188 B.R. 533 (Bankr.D.Md.1995).

The most difficult element to prove in credit card cases relates to the intent to deceive. *In re Rodriguez,* 138 B.R. 112 (Bankr.S.D.Fla.1992).

A creditor may prove, by circumstantial evidence, a fraudulent intent for the purposes of the discharge exception for false pretenses, fraud and false representation. *In re Arlington,* 192 B.R. 494 (Bkrtcy. N.D.Ill.1996). While the intent to deceive

a creditor, within the meaning of the discharge exceptions for debt obtained by false representations may not be presumed, the totality of the circumstances may lead to the inference that the requisite degree of intent to deceive was present. *Matter of Richmond*, 29 B.R. 555 (Bkrtcy.M.D.Fla.1983).

*Planters and Growers Golden Leaf Warehouse v. Baird (In re Baird)*, Nos. 96–75437, 97–80112, (Bankr.D.S.C. Oct. 1, 1997).

■ South Carolina is among the courts that have adopted a list of factors to be considered in determining the intent of the debtor. These criteria include

1. the length of time between the charges and bankruptcy petition;

2. the number of charges made;

3. the amount of the charges;

4. whether charges were above the credit limit on the account;

5. whether there exists a sharp change in the debtor's buying habits;

6. whether there were multiple charges on the same day;

7. the financial sophistication of the debtor;

8. the financial condition of the debtor at the time the charges were made;

9. whether an attorney had been consulted about bankruptcy before the charges were made;

10. the debtor's employment circumstances;

11. the debtor's prospects for employment; and

12. whether the purchases were made for luxuries or necessities.

*In re Richardson*, 179 B.R. at 795. The creditor need not prove the existence of all of these factors in order for the court to find the requisite intent to deceive. *In re Valdes*, 188 B.R. at 537; *In re Williams*, 85 B.R. 494, 499 (Bankr.N.D.Ill.1988).

■ Additionally, while these factors are useful in arriving at a finding of bad faith, the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith. *In re Koop*, 212 B.R. 106 (Bankr.E.D.N.C.1997) cit-

ing *In re Anastas*, 94 F.3d 1280 (9th Cir. 1996). *In re Simos*, 209 B.R. 188 (Bankr. M.D.N.C.1997). The test for determining the debtor's intention to pay is not an objective standard of whether a reasonable person would have known there was an inability to pay but a subjective standard of an inability to pay. *In re Koop*, 212 B.R. at 109; *In re Karelin*, 109 B.R. 943 (9th Cir. BAP 1990); *In re Simos*, at 192; *In re Fulginiti*, 201 B.R. 730, 735 (Bankr.E.D.Pa.1996).

■ The Debtor, Greg Godbout, testified at the hearing that he owns and operates Team Motorsports, a sports car restoration and sales business. From his testimony this Court concludes that the Debtor sustained tremendous losses at the business in 1995 as a result of a devastating fire; that the cash flow of the Debtor was completely interrupted and he began to rebuild the business; that the Debtor has a "bad faith" claim pending against USF & G for failure to timely pay his insurance claims.

At the hearing, the Debtor introduced testimony through Hearon McCravy, a business broker from Spartanburg, South Carolina. Mr. McCravy testified that he had been working with the Debtor to secure a loan from the Small Business Administration for up to six months prior to the filing of the petition. The Debtor testified that he was unable to secure this loan before filing as the Internal Revenue Service had threatened to levy against the bank accounts of Team Motorsports and that it was the threat of the levy by the internal Revenue Service that caused the sudden filing of the bankruptcy petition.

The Debtor further testified that he had also had a financing arrangement with B & H investors during 1996 to assist him to rebuild his fire ravaged business. He stated that he was engaged in discussions with a Mr. Theo regarding refinancing immediately prior to the filing of the petition. This court concludes that although the Debtor was struggling at the time of the credit card charges, the Debtor was still operating and actively seeking funding for his business. With the claim against the insurance company pending as well as the potential for loans

through the SBA or individuals, this Court cannot conclude that the Debtor recklessly incurred the charges with the intent not to repay.

Further, there was no testimony that the Debtor had consulted with a bankruptcy attorney prior to incurring the charges. Although the last charge did put the Debtor over his credit limit, there were no multiple charges on the same day, and the charges were incurred over 80 days prior to filing.

Based upon the totality of the circumstances, this Court finds that the Debtor intended to repay the credit card charges.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that the Plaintiff has failed to meet its burden of proof;

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that credit card debt to First Card Services, Inc. is discharged as to Greg Godbout, the individual debtor. This decision has no bearing or effect on the corporate debtor, Team Motorsports, Inc., because as a matter of law its liability to Plaintiff is nondischargeable.

**AND IT IS SO ORDERED.**