In re Amjad E. EASHAI, Debtor.

Amjad E. EASHAI, Appellant,

v.

CITIBANK, SOUTH DAKOTA,
N.A., Appellee.

BAP No. CC–92–2287–VJO.
Bankruptcy No. LA91–95367 VP.
Adv. No. LA91–01271 VZ.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted on March 23, 1994.

Decided May 11, 1994.

Andrew Edward Smyth, Los Angeles, CA, for appellant.

Darvy Mack Cohan, La Jolla, CA, for appellee.

Before VOLINN, JONES and OLLASON, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

The debtor appeals a money judgment and judgment of nondischargeability for $22,567 in credit card debt. The court determined the debt to be nondischargeable after considering the factors enumerated in the BAP case *In re Dougherty*, 84 B.R. 653 (9th Cir. BAP 1988). Debtor contends that *Dougherty* misconstrues 11 U.S.C. § 523(a)(2)(A) [1], basing this contention on *obiter dicta* by the trial court that his credit card debt could not support a state court claim for fraud. Debtor asserts that credit card debt cannot be excepted from discharge pursuant to § 523(a)(2)(A) without proof of all the elements of a state law fraud action.

Debtor does not take issue with the court's findings of fact which in our view encompass the requisite elements of common law fraud, and we therefore AFFIRM.

### FACTS AND PROCEEDINGS BELOW

Debtor obtained various credit cards while employed as a car lease consultant, at which he earned some $24,000 a year. In April of 1990, he injured his back and became unemployed. He has not worked steadily since

---

1. Debt incurred under a revolving line of credit is analyzed under 11 U.S.C. § 523(a)(2)(A), which states:

   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

   . . . .

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

   (A) false pretenses, a false representation, or actual fraud. . . .

11 U.S.C. § 523(a)(2)(A).

the injury. His sole income after his injury was $1,200 in monthly disability compensation, while his monthly expenses amounted to $3,300, thereby creating a monthly deficit of $2,100. During this same period, debtor held 26 credit cards. The minimum payments due on these cards totalled some $2,000 a month. Thus, he was demonstrably unable to make any payment on any of his credit card debt without somehow gaining access to further resources; the record shows that debtor accomplished this by kiting his credit cards.

Creditor Citibank (South Dakota), N.A., issued debtor a card in 1988. Debtor's Citibank card had been dormant with a zero balance for some time. Once unemployed, however, debtor began using the card again. Creditor offered, and debtor accepted, increasingly large credit limits on the card. By the time debtor filed his Chapter 7 petition on October 18, 1991, his credit limit was $20,000 and his balance, including finance payments, was $22,567.79. Debtor admitted at trial that he was indebted for some $100,000 on various credit cards. Debtor's schedules list $141,000 in unsecured debt, primarily from credit cards. Creditor established at trial that debtor used cash advances on his Citibank card to maintain current minimum monthly payments on his debt as well as for living expenses. During this period, he withdrew $10,000 in a cash advance against his Citibank card and invested in gold bars. He subsequently suffered a loss, reselling the gold for $6,500. During this period, he withdrew traveller's checks on credit to finance a trip to visit his family in Pakistan, and took a cousin gambling in Las Vegas, where he lost some $1,000.

Evidence at the trial was focused on debtor's charging habits to prove a contemporaneous intent not to repay the debt when the charges were made. Debtor testified at trial that he intended to honor his contract with Citibank when he made the charges. The court found that this was untrue. The court found that debtor was employing a sophisticated credit card kiting scheme in which he would maintain his credit by borrowing from others to meet the minimum payments required. The court noted that debtor was hopelessly insolvent, with no real expectation of an ability to repay a constantly spiralling debt. The court adjudged the debt nondischargeable, and debtor timely appealed.

## ISSUE PRESENTED

Whether a court may infer a present intention not to repay from a debtor's use of a credit card at a time when the debtor has no present ability nor any reasonable prospect of repaying the creditor.

## STANDARD OF REVIEW

■ Although debtor asserts the issue he raises is one of law, which the panel reviews *de novo*, the court's finding that debtor had no intention to repay the debt according to the terms of the contract is a question of fact which is subject to the clearly erroneous standard of review pursuant to Fed. R.Bankr.P. 8013.

## DISCUSSION

### I

■ Debtor did not argue the validity of *Dougherty* at trial and raises the issue for the first time on appeal. While the issue could be deemed waived for this reason, we do consider it and conclude that debtor not only misconstrues *Dougherty* but disregards the court's findings of fact and conclusions of law. Essentially, *Dougherty* does not differ in perspective from the criteria applicable in a state court fraud claim. To frame a claim for actual fraud, a plaintiff must prove the following elements:

(1) that the debtor made representations;

(2) that at the time he knew the representations were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations.

*Dougherty* at 656 (citations omitted). The creditor must sustain its burden of proof for each element by a preponderance of the evi-

dence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

As the panel discussed in *Dougherty*, two theories had developed in the area of application of the above five elements in credit line cases—the "implied representation" theory and the "assumption of the risk" theory.

> In cases involving the dischargeability of credit card obligations, two lines of authority have developed. The majority of courts that have addressed this issue conclude that when a credit card is used, the cardholder impliedly represents that he or she has the ability and the intention to pay for the goods or services charged. This theory is typically referred to as the "implied representation" theory. *See In re Faulk*, 69 B.R. 743, 752 (Bankr.N.D.Ind. 1986) (noting that this is the majority view and citing cases in accord). The minority position is that the cardholder does not, by merely using the credit card, make any representation to the issuer. Rather, the cardholder makes a false representation to the issuer only when revocation of the card is communicated to the cardholder and the cardholder continues to use the card. Under this theory, the credit card issuer assumes the risk that the cardholder will incur debts he or she cannot pay until the user's right to possess and use the card is revoked and the revocation is communicated. Thus only credit card charges made after the cardholder/debtor learns of the issuer's revocation of the card may be nondischargeable. This theory is typically referred to as the "assumption of the risk" theory. *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983); *In re Carpenter*, 53 B.R. 724, 728 (Bankr. N.D.Ga.1985).

*Dougherty* at 655–56.

■ *Dougherty* rejected the "implied representation" theory because all five elements of a fraud claim must be affirmatively proved in order to prevent a credit card creditor's unfair advantage over other creditors and to foster bankruptcy's fresh start by strict construction of exceptions to discharge in favor of the debtor. *Id.* at 656. *Dougherty* also rejected the "assumption of the risk" theory because it would give license to dishonest debtors to evade payment of fraudulently incurred debts by receiving a discharge in bankruptcy. *Id.* at 656–57. In *Dougherty*, we distinguished between the representation of intent to repay and ability to repay. The burden is on the card issuer to prove that the borrower intended to incur the debt without repaying it. To that end, *Dougherty* cited with approval a list of nonexclusive factors enunciated in *In re Faulk*, 69 B.R. 743, 757 (Bankr.N.D.Ind.1986), for courts to consider when determining whether a credit card debtor committed actual fraud through use of a credit card.[2] *Dougherty* does not stand for the proposition that these factors create a type of "constructive fraud" that is nondischargeable, as implied by *In re Cirineo*, 110 B.R. 754 (Bankr.E.D.Pa.1990). The factors do not constitute a singular formula; they were stated to provide a guide for evidence of an inferential nature which may be considered by the court in evaluating the actual intent of the debtor at the time the card was used. Needless to say, because the debtor's primary line of defense is that he did not intend to defraud, and because debtors will seldom admit of an intent to defraud, proof of such intent is a major element in § 523(a)(2) litigation.

## II

■ Credit fraud generally involves a borrower's contemporaneous misrepresentation of his ability to repay the debt upon which representation the lender relies in extending

---

**2.** 1. The length of time between charges made and bankruptcy filing.
2. Whether an attorney was consulted regarding bankruptcy before the charges were made.
3. The number of charges made.
4. The amount of the charges.
5. The debtor's financial condition when the charges were made.
6. Whether the charges exceeded the credit limit of the card.
7. Whether multiple charges were made on the same day.
8. Whether the debtor was employed.
9. The debtor's prospects for employment.
10. The debtor's financial sophistication.
11. Sudden changes in the debtor's buying habits.
12. Whether the purchases were for luxuries or necessities.
*Dougherty* at 657.

credit. *See, e.g.* § 523(a)(2)(B), excepting from discharge credit obtained through use of a false written financial statement reflecting the borrower's ability to repay the loan. It would be inappropriate to impute to the debtor an ever-present ability to repay over the course of the revolving credit relationship—this is precisely the risk that any creditor assumes when issuing a line of credit.

On the other hand, the creditor does not assume the risk of dishonesty. The credit card issuer's reliance on the borrower's good faith compliance with its contractual terms is grounded in its issuance of the card to the borrower, and this bona fides and reliance on it by the creditor does not dissipate over the course of time.

Credit cards are a pervasive and major element in our consumer economy. "The typical American family now has an average of 4.6 cards. A family making over $75,000 a year has 7.4 cards." *Credit Card Disclosure Act: Hearings on H.R. 2440 Before the Subcomm. on Consumer Affairs and Coinage, Committee on Banking, Finance and Urban Affairs,* 102nd Cong., 1st Sess., 137 Cong. Rec. E3975–03, (1991) (statement of Hon. Charles E. Schumer, New York). The preliminary total of outstanding revolving consumer credit in January 1994 was $284.8 billion. *Federal Reserve Statistical Release,* 4 p.m. (Eastern Time) March 7, 1994. Our consumer economy would founder if credit card transactions were not carried on in good faith; the Bankruptcy Code is not intended to be a sanctuary for dishonest debtors.

■ Use of the credit card is attended by an obligation on the part of the cardholder to make bona fide use of it. Such good faith means that he cannot use the credit card with reckless indifference to his actual circumstances. Here, the debtor's circumstances were such that the court could infer, as it did, that he could not have reasonably expected to repay the debt.

■ This type of inference is demonstrated in *In re Karelin,* 109 B.R. 943 (9th Cir. BAP 1990), which held nondischargeable a credit card debt incurred by a debtor who used her credit card to finance gambling binges while hopelessly in debt. She took advantage of the lag in the bank's debits against her account and knowingly borrowed $57,000 over her credit limit. The panel found ample evidence in the record that, although the debtor might have had a subjective desire to repay, her financial condition was such that she could not possibly have failed to perceive the hopelessness of repaying the debt when it was incurred. *Id.* at 947. It should be noted that *Karelin* cautioned:

> Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of nondischargeability. Such a rule would unduly expand the "actual fraud" discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge.

*Id.* at 947–48.

This analysis balances the divergent concerns. The lender is not awarded a lightened burden by a presumption, without proof beyond use of the card, of the element of intent in its fraud claim, while free rein is not allowed to a dishonest credit card debtor.

### III

■ Use of a credit card without a reasonable prospect of ability to repay or to meet its contract terms is circumstantial evidence from which a court may infer a fraudulent intent. This is the inference the trial court drew here. Although debtor has not challenged the trial court's findings of fact, it is apparent that those findings are not clearly erroneous. Citibank presented evidence of debtor's intent to defraud it, which debtor denied. While the debtor's profligate investment in gold bars or his trips to Las Vegas and Pakistan do not connote actual fraudulent intent, they do speak to recklessness, considering his circumstances. Moreover, it is clear by his own admissions that debtor was robbing Peter to pay Paul. *See In re Kurali,* 132 B.R. 468, 469 (Bankr.M.D.Fla. 1991). The court found that debtor realized

his ability to continue his scheme was untenable. The court found that debtor's intent to maintain even minimum payments was unrealistic, and that debtor knew that minimum payments alone would not be sufficient to retire the debt. The court found that Citibank's placement at the tail end of the kiting scheme demonstrated that debtor had no intention to repay his debt to Citibank when he availed himself of its line of credit, but rather, that debtor prospectively intended to escape his debt through bankruptcy. These findings are not clearly erroneous.

### CONCLUSION

Debtor was found to have committed a fraudulent scheme by which he obtained money from creditor Citibank without intending to repay it. Debtor's act constitutes actual fraud, and as such, the debt arising therefrom is nondischargeable.

AFFIRMED.