In re Carlos VALDES, Sheila
C. Valdes, Debtors.

HECHT'S, A DIVISION OF the MAY
DEPARTMENT STORES CO.,
Plaintiff,

v.

Carlos VALDES, Sheila C.
Valdes, Defendants.

Bankruptcy No. 94–1–5997–PM.

Adv. No. 95–1–A036–PM.

United States Bankruptcy Court,
D. Maryland.

Nov. 13, 1995.

Warren Rosenfeld, Washington, DC.

John Owen, Jr., Hyattsville, MD.

Michael Wolff, Trustee, Gaithersburg, MD.

## MEMORANDUM OF DECISION

PAUL MANNES, *Chief Judge.*

Before the court is a Complaint to Determine Dischargeability of Debt filed by Hecht's, a Division of the May Department Stores Company ("Hecht's"). Plaintiff seeks a ruling that $732.16 in unpaid charges be declared nondischargeable. This court has jurisdiction pursuant to 28 U.S.C. § 1334 (District Courts have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) and Maryland District Court Local Rule 402 (all cases under Title 11 as proceedings arising under Title 11 or arising in or related to cases under Title 11 are deemed referred to the Bankruptcy Judges of this District). This action is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

The debtors, Carlos Valdes and Sheila C. Valdes, filed a joint petition under Chapter 7 of the Bankruptcy Code on November 14, 1994. As of the date of filing, Mr. Valdes owed $1,134.93 to the plaintiff, $713.16 of this debt resulted from five charges made between August 28, 1994, and September 21, 1994, on Mr. Valdes' Hecht's credit card. The purchases consisted of twin mattresses, cookware, a television set, a handbag, and clothing.

Plaintiff named Sheila C. Valdes as a defendant. It offered no evidence of any involvement on her part in the purchases. Only at final argument did plaintiff's counsel state, "We are only pursuing Carlos at this point" (Transcript, p. 27). Counsel was unable to point to a scintilla of evidence justifying her inclusion as a defendant. Bankruptcy Rule 9011(a) appears applicable.[1]

Plaintiff pleaded that the debtors made these purchases on "their" Hecht's credit

---

1. This court questions whether the plaintiff's counsel adequately investigated the circumstances of this case prior to naming Mrs. Valdes as a defendant to this action as required by Bankruptcy Rule 9011. Certainly Hecht's, as the issuer of the credit card and the vendor of the merchandise charged thereon, had all necessary information to ascertain whether Mrs. Valdes was a proper defendant. Attorneys must make a reasonable inquiry into the facts and circumstances surrounding the case prior to representing such facts to a court.

card while intending not to repay the debt. Plaintiff argued that these purchases were made by Mr. Valdes when he knew or should have known that such debt could not be repaid. Therefore, plaintiff argues the debt must be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). In support of this contention, the plaintiff relies heavily on the fact that, at the time the debtors filed this bankruptcy case, their combined income was only $3,368.38 and their total monthly liabilities amounted to $3,427.00. Plaintiff avers that the debtors' desperate financial condition at the petition date is indicative of their financial condition at the time the purchases were made as the purchases were made only seven weeks prior to the petition date. Plaintiff further notes that prior to the Hecht's credit card purchases, the debtors already had incurred approximately $12,-787.00 in unsecured debt between them from twelve other credit card accounts.

Debtor denies any fraudulent intent to deceive the plaintiff. Rather, Mr. Valdes states that he fully intended to repay his debt to the plaintiff when the purchases were made. Mr. Valdes attributes his inability to pay the plaintiff to two unexpected and unforeseen expenses that arose subsequent to the date of the subject purchases. He stated that he was forced to make repairs to his automobile and pay for medical bills incurred by his mother.[2] These unexpected expenses depleted his available income, making him unable to make payment to the plaintiff, as well as his other creditors.

## DISCUSSION

The plaintiff's claim for nondischargeability of this debt is brought pursuant to 11 U.S.C. § 523(a)(2)(A), that provides:

§ 523. **Exceptions to discharge.**

(a) A discharge under 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

◼ The objecting creditor bears the burden of proving the nondischargeability of the debt under § 523 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–90, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991).

◼ Courts generally are in agreement that the traditional elements of fraud must be applied and proven to sustain a cause of action under § 523(a)(2)(A). These elements are:

(1) that the debtor made a representation;

(2) that at the time he knew the representations were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations.

*In re Eashai*, 167 B.R. 181, 183 (CA9 BAP1994); *In re Weiss*, 139 B.R. 928, 929 (BC S.D.1992).

◼ In applying the above elements to situations involving credit cards, courts generally follow one of three legal theories. *See generally*, 2 David G. Epstein et al., *Bankruptcy* § 7–26 (1992); *Chase Manhattan Bank N.A. v. Ford (In re Ford)*, 186 B.R. 312 (BC N.D.Ga.1995). The first theory commonly is referred to as the "implied representation" theory. Under this theory, the card holder impliedly represents, upon using the credit card, that he or she has both the ability and the intent to pay for the goods or services charged. *In re Faulk*, 69 B.R. 743, 752 (BC N.D.Ind.1986). Thus, two of the required elements, representation and reliance, are satisfied through implication as opposed to strict proof. This fiction is required, because at the time of the transac-

---

**2.** The debtor, his brother and sister shared equally the expenses incurred as a result of their mother's Alzheimer's disease.

tion, in most cases, the cardholder and the credit extender have no personal contact.[3]

In rejecting the implied representation theory, this court adopts the analysis of *In re Ford,* 186 B.R. 312, 317 (BC N.D.Ga.1995).

Without doubt, the implied representation doctrine solves the problem of fitting credit card transactions within the section 523(a)(2)(A) criteria. However, the employment of such a fiction breeds its own series of concerns, the majority of which arise from the ability-implying prong of the doctrine. First, to the extent that it makes each card user an absolute guarantor of his ability to pay, the doctrine offends the balance of bankruptcy policy struck by section 523. Second, inferring a guarantee of ability runs afoul of consumer practice and the natural course of events in the marketplace. Third, using such a series of presumptions gives card-issuing creditors an unfair advantage over normal creditors, who have to establish each and every element of fraud before a court will consider their claims non-dischargeable. Lastly, and most importantly, by constructing a separate implied representation of ability, the doctrine suggests that a breach of that duty, in and of itself, will present sufficient grounds for denying a debtor his discharge. Faced with it inherent problems, pro-creditor orientation and risks of misapplication, a majority of courts nonetheless have adopted the implied representation theory as the rule for credit card non-dischargeability issues. *See Citibank (S.D.), N.A. v. Dougherty (In re Dougherty),* 84 B.R. 653, 655–56 (9th Cir. BAP 1988) (noting the majority view).

Some courts, in rejecting the "implied representation" theory, refuse to imply "actual fraud" based solely on the insolvency of the debtor. *See In re Hiemer,* 184 B.R. 345, 348 (BC Neb.1995). This inference presents creditors with a significant advantage in bankruptcy. It has the effect of making all debts of this nature non-dischargeable, because nearly all debtors are insolvent to some degree when a Chapter 7 bankruptcy case is filed. *Id.*

■ The second theory, known as the "assumption of the risk" theory, holds that the cardholder, merely by using the credit card, does not make any representations to the issuer. Rather, under this theory, the charges are excepted from discharge only if the cardholder continues to use the credit card after the issuer unequivocally and unconditionally revokes the cardholder's right to possess and use the credit card, and communicates such revocation to the cardholder. *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932–33 (CA11 1983).[4] The rationale underlying this theory is that the issuer assumes the risk that the cardholder will incur debts he or she cannot repay. *Id.; see also In re Dougherty,* 84 B.R. 653, 656 (CA9 BAP1988).[5]

As with the "implied representation" theory, the "assumption of the risk" theory also has met criticism. Courts rejecting this theory note that the creditor is placed in a virtually impossible position with respect to charges incurred prior to the revocation of charging privileges. *In re Dougherty,* 84 B.R. at 656, 657. During the pre-revocation period, all charges would be discharged regardless of the debtor's intent, thereby leaving the creditor with little or no recourse

**3.** Defendants do not argue that § 523(a)(2)(A) is inapplicable to these facts. Ordinarily, nondischargeability findings based upon misstatements of a debtor's financial condition are limited to statements in writing. *See generally, Engler v. Van Steinburg,* 744 F.2d 1060 (CA4 1984); *Blackwell v. Dabney,* 702 F.2d 490 (CA4 1983).

**4.** While the Eleventh Circuit decision in *Roddenberry* considered the nondischargeability of credit card debts under § 17(a)(2) of the Bankruptcy Act, courts continue to use that decision for guidance as the differences between § 523(a)(2)(A) and § 17(a)(2) are minimal. *See Birmingham Trust Nat'l Bank v. Case,* 755 F.2d

1474, 1476 (CA11 1985); *In re Johnson,* 141 B.R. 473, 477 (BC M.D.Ga.1992).

**5.** Interestingly, it has been observed that the high interest rates and finance charges imposed by credit card lenders factor in the risk of non-payment and non-compliance with the terms of the loans. *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932 (CA11 1983). The theory is that these types of creditors should not be afforded additional protection under § 523 of the Code for actions that unwisely permit or encourage debtors to exceed their credit limits. *Id.*

even under the most egregious of situations. The focus should not be on the conduct of the "improvident creditor" but on a fundamental tenet of bankruptcy—the discharge and fresh start are intended for the honest, but unfortunate debtor. *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

 The third theory, known as the "totality of the circumstances" theory, is set out and adopted in *In re Faulk,* 69 B.R. 743, 757 (BC N.D.Ind.1986). Under this theory, a court may infer the existence of the debtor's intent not to pay if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor. *Id.* at 755. This theory is similar to the "assumption of the risk" theory in that any charges made after the issuer communicates the revocation of the card privileges will be rendered nondischargeable. *Id.* at 756. With respect to charges made prior to the issuer's revocation, however, the debt still may be deemed non-dischargeable provided that the objecting creditor proves that the debt was incurred through "actual fraud." In determining whether "actual fraud" exists, courts have employed a test involving twelve factors. They are as follows:

(1) The length of time between the charges made and the filing of the bankruptcy;

(2) Whether or not an attorney has been consulted concerning the filing of the bankruptcy before the charges were made;

(3) The number of charges made;

(4) The amount of the charges;

(5) The financial condition of the debtor at the time the charges were made;

(6) Whether the charges were above the credit limit of the account;

(7) Whether the debtor made multiple charges on the same day;

(8) Whether or not the debtor was employed;

(9) The debtor's prospects for employment;

(10) Financial sophistication of the debtor;

(11) Whether there was a sudden change in the debtor's buying habits; and

(12) Whether the purchases were made for luxuries or necessities.

*In re Richardson,* 179 B.R. 791, 795–96 (BC S.C.1994). The plaintiff need not prove the existence of all of the factors in order for a court to find the requisite intent to deceive. *In re Williams,* 85 B.R. 494, 499 (BC N.D.Ill. 1988). The above list of factors is not exhaustive. Some courts consider whether the debtor made any payments on the account after incurring the subject charges, *see In re LeMaster,* 142 B.R. 927, 928 (BC Idaho 1992); *In re Vermillion,* 136 B.R. 225, 226–27 (BC W.D.Mo.1992), and whether the debtor made charges exceeding the credit limit of the account. *See In re Marlar,* 142 B.R. 304, 305 (BC E.D.Ark.1992). Other courts consider how the relationship between the debtor and the creditor was created and how it was maintained. *See In re Brawner,* 124 B.R. 762, 765 (BC N.D.Ill.1991).

 This court adopts the "totality of the circumstances" theory. It avoids the pitfalls and shortcomings of the other two theories.[6] When applying this theory, however, the court must remain mindful of two very important yet competing interests. The fraudulent use of a credit card involves a misrepresentation by the cardholder as to his ability to repay the debt. Such dishonest action is not to be assumed by the issuer of the card. The cardholder is obligated to use the card in

**6.** The use of the above factors has been widely accepted by other courts. In fact, these factors have even been employed by courts adhering to either the "implied representation" theory or the "assumption of the risk" theory. *See, e.g., In re Eashai,* 167 B.R. 181, 184 (CA9 BAP1994) (following the "totality of the circumstances" theory); *In re Ford,* 186 B.R. 312, 320 (BC N.D.Ga. 1995) ("[C]ourts should determine the existence of that misrepresented intent by looking to the totality of the circumstances."); *In re Orndorff,* 162 B.R. 886, 889 (BC N.D.Okla.1994) ("totality of the circumstances" theory); *In re Rivera,* 151 B.R. 602, 605 (BC M.D.Fla.1993) (following the "assumption of the risk" theory); *In re Foley,* 156 B.R. 645, 649 (BC N.D.1993) (following the "implied representation" theory); *In re Pursley,* 158 B.R. 664 (BC N.D.Ohio 1993) (following the "implied representation" theory).

good faith, and not with reckless indifference to one's actual circumstances. On the other hand, it would be inappropriate to impute to the debtor an ever-present ability to repay over the course of the revolving credit relationship as this is precisely the risk that any creditor assumes when issuing a line of credit. *In re Eashai,* 167 B.R. 181, 184–85 (CA9 BAP1994). The Bankruptcy Appellate Panel for the Ninth Circuit instructs:

> Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of non-dischargeability. Such a rule would unduly expand the "actual fraud" discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge.

*In re Karelin,* 109 B.R. 943, 947–48 (CA9 BAP1990). Thus, a debtor's insolvency does not create a conclusive presumption that a debtor lacked the intent to repay the debt. *In re Hiemer,* 184 B.R. 345, 348 (BC Neb. 1995); *In re Dougherty,* 143 B.R. 23, 26 (BC E.D.N.Y.1992) ("all courts agree that credit card usage by a debtor whose obligations exceed income does not, per se, sustain nondischargeability"). Rather, insolvency merely is a factor to be considered by a court when determining whether the debtor intended to repay the debt. *In re Hiemer,* 184 B.R. at 348. Many consumers manage their affairs quite well while insolvent. This is done through various devices, including borrowing from one creditor to pay another. Many can keep this up for a lifetime. Others may be sucked further and further into the abyss of ultra high interest consumer credit, filing bankruptcy only when they see what might be obvious to a disinterested observer months or years earlier. Their naivete and optimism do not amount to fraudulent conduct.

Furthermore, creditors knowingly and intentionally take full advantage of a credit card debtor's deferrals and defaults. A debtor's failure to pay the account in full enables the credit issuer to charge and receive interest, as here, up to 21.5% per annum on the unpaid balance. Here, one assumes that Hecht's sold the subject merchandise at a profit.

■ Reviewing the facts and circumstances of the instant case, the court finds that the debtor did not intend to misrepresent his ability and intent to repay his debt to the plaintiff. *See In re Neal,* 35 B.R. 64, 66 (BC Md.1983) (Mannes, J.).[7] Rather, the debtor irretrievably overextended his credit, and, as a result, entangled himself in a classic scenario leading to bankruptcy. This conclusion is supported by a review of the applicable factors mentioned above and the court's appraisal of defendant's testimony in this case.

The court finds that the debtors were not in a hopeless or desperate financial situation at the time the charges were made. At the petition date, the debtors' monthly expenses exceeded their monthly income by a mere $58.00. Although their obligations slightly exceeded their income, the debtors had been meeting their debts as they became due.[8] Thus, Mr. Valdes was not in such a perilous financial situation that he knew or should have known that he could not repay the debt to the plaintiff and that he incurred the credit obligations knowing that he had no ability to repay them.

The debtors filed their bankruptcy petition on November 14, 1994, 55 days after the debtor's last charge. The purchases were not made on the eve of bankruptcy. There was no evidence that the subject purchases were made after Mr. Valdes spoke with a bankruptcy attorney.

---

7. In *In re Neal,* 35 B.R. 64 (BC Md.1983), this court held the debt owed to the creditor by the debtor was dischargeable despite the fact that the debtor submitted a false financial statement that was reasonably relied upon by the creditor because, at the time that the false statement was made, the debtor believed that it was accurate.

8. The court notes that the schedule J of current expenditures reflects an expenditure in the amount of $350.00 per month for tuition. Testimony revealed that the debtor no longer has this expense. The deficit of $58.00 thus becomes a surplus of $292.00.

Mr. Valdes made five charges over a 25–day period. The number of charges made on the account do not appear to be excessive compared to the debtor's spending record, nor do these charges indicate a sudden change in the debtor's actions just prior to the filing of the bankruptcy petition. Thus, there was not sufficient evidence demonstrating that Mr. Valdes embarked on a pre-bankruptcy spending spree. *Compare In re Sutliff,* 112 B.R. 680, 682 (BC M.D.Pa.1990) (debt held non-dischargeable where debtor had charged 134 separate items over a two month period; while unemployed and exceeding his credit limit).

Although there were multiple charges incurred on the same day, all but one of the purchases arguably were for necessities as opposed to "luxury goods." There was no evidence presented at the trial, nor were there any allegations in the pleadings, that Mr. Valdes exceeded his credit limit or that the plaintiff sought to revoke Mr. Valdes's charging privileges. Plaintiff voluntarily entered into this financial relationship with Mr. Valdes at a point in time when he already had incurred significant unsecured credit card debt. *See In re Hiemer,* 184 B.R. 345, 348–49 (BC Neb.1995).

Mr. Valdes testified that his inability to pay plaintiff was due to the unexpected medical expense for his mother and the unforeseen expense for the repairs to his automobile. This testimony was credible and undisputed. The referenced expenses arose subsequent to the purchases made on the Hecht's charge card. Unforeseen or unexpected expenses that impair a debtor's ability to repay accumulated debts have been taken into consideration by courts when making a determination of this kind. *See In re Wood,* 571 F.2d 284, 285 (CA5 1978).

Plaintiff has not sustained its burden of proof. It lacks evidence of the element of deceit necessary to hold the debt nondischargeable. The court therefore finds that Mr. Valdes merely acted with a misconceived optimism while in a fragile financial state. This was compounded by the occurrence of subsequent unexpected expenses. Such actions, while not prudent, do not amount to fraudulent conduct. The debt to plaintiff is dischargeable.

Because plaintiff failed to prove the requisite intent to deceive, the court need not address the issue of reliance and other elements of fraud. This debt being dischargeable, the court need not address whether Mr. Valdes is liable for attorney's fees and costs pursuant to the terms of the credit card application.

An order will be entered in accordance with the foregoing.