**In re Ashley Lewis HOWARD and Sharon Lynn Howard, Debtors.**

**Universal Bank, N.A., Plaintiff,**

**v.**

**Sharon Lynn Howard and Ashley Lewis Howard, Defendants.**

**Bankruptcy No. 00–21604.**
**Adversary No. 00–214.**

United States Bankruptcy Court, S.D. West Virginia.

March 5, 2002.

William M. Watkins, III, Scott Depot, WV, for Debtors.

Charles I. Jones, Jr., Charleston, WV, trustee.

### ORDER GRANTING JUDGMENT FOR THE DEFENDANTS

RONALD G. PEARSON, Bankruptcy Judge.

On June 19, 2001, a trial was held on the Complaint of Universal Bank, N.A. objecting to the discharge of the debt owed by Sharon Lynn Howard and Ashley Lewis Howard pursuant to 11 U.S.C. § 523(a)(2)(A). For the reasons that follow, the Court finds in favor of the Defendants.

### I. FACTS

Ashley Lewis Howard worked as a draftsman until he was laid off on March 3, 2000. Sharon Howard has worked at odd jobs over the past several years, but due to medical problems has chosen to stay home to care for the couple's three children. A few days before Mr. Howard lost his job, Debtors had purchased a second home in Scott Depot, West Virginia. Debtors intended to move into the second home and lease their former home to pay the mortgages.

In May of 2000, Debtors received a solicitation for a credit card with a preapproved credit limit of $5000.00 from the Plaintiff, Universal Card, N.A. ("Universal"). To take advantage of the lower rate of 2.9% on balance transfers, Debtors applied for and were issued the credit card. Debtors subsequently transferred $3,060 outstanding on one of their other credit cards to the Universal account. Additionally, during the period of May 26, 2000 to June 21, 2000, Debtors made 29 purchases totaling $1,804.76 and one cash advance in the amount of $93.00. Universal does not contend that these purchases were for luxury items, and Ms. Howard testified that a majority of the purchases were for groceries and miscellaneous items like soap and toilet tissue.[1] The Debtors continued to make purchases until they reached their credit limit of $5,000. No payments were made on the account.

Even though Mr. Howard was unemployed at the time the Debtors received the solicitation from Universal, Debtors indicated on the credit application that Mr. Howard had annual income of approximately $30,000.00. Based on Mr. Howard's work history, Debtors anticipated that Mr. Howard would be employed within a matter of weeks. As a draftsman, Mr. Howard would work on a temporary or contractual basis. Mr. Howard testified, that "quite often as a contractor, a company will let me go to bring somebody in that has a different type of understanding of the structure. Maybe I will be replaced by an architect..." It would generally take Mr. Howard, at the most, about two weeks to get another job. According to Mr. Howard, throughout the 12 calendar quarters of the years 1997, 1998 and 1999,

---

**1.** The credit card statements from Universal indicate that a majority of the transactions were with gasoline vendors and grocery stores.

he had gainful full-time employment as a draftsman.

The Debtors also testified that at the time they received the solicitation and while they were making purchases on the Universal account in May of 2000 that they had hoped to sell their stock to help pay the bills while Mr. Howard was unemployed. The Debtors had invested $5,000 for the purchase of stock in February 2000. At one point in May, Mr. Howard testified, at the time they were making purchases on the Universal Credit Card, the stock was valued at 10,000. The February 28 to March 31, 2000 statement from Salomon Smith Barney provided that the value of the stock had a value of 4,162.90. However, by June 30, a statement from Salomon Smith Barney indicated that the value of the stock had diminished to 1,162.90. By the end of 2001, the stock had nearly no value.

Though Mr. Howard was drawing $1000.00 per month in unemployment benefits, which was approximately half his prior take home pay, Debtors were unable to make their minimum monthly debt payments. After contacting a credit counseling service, which declined to provide assistance due to the mortgages involved, Debtors consulted a lawyer in August of 2000. On September 1, 2000, Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Universal filed this adversary proceeding on November 24, 2000.

## II. DISCUSSION

Universal Bank alleges that the debt owed to it is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B). Under subsection (A), a debtor may not discharge debts for money obtained by "false pretenses, false representations, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §§ 523(a)(2)(A).

■ To prevail under section 523(a)(2)(A), a creditor must prove the following traditional fraud elements by a preponderance of the evidence:

1. Debtor made a representation to the creditor.

2. That the Debtor knew the representation was false at the time it was made

3. That the Debtor made the representation with the intention and purpose of deceiving the creditor.

4. That the Creditor justifiably relied on the representation.

5. That Creditor sustained a loss or damage as result of the representation.

*Hechts v. Valdes (In re Valdes),* 188 B.R. 533 (Bankr.D.Md.1995); *In re Eashai,* 167 B.R. 181 (9th Cir. BAP 1994).

There are three theories that courts generally follow when applying section 523 to credit card transactions. *See First Card Services, Inc. v. Kitzmiller,* 206 B.R. 424 (Bankr.N.D.W.V.1997) (citing *Chase Manhattan Bank, N.A. v. Ford (In re Ford),* 186 B.R. 312 (Bankr.N.D.Ga.1995)). The first is the "implied representation" theory, where a cardholder impliedly represents upon using the credit card that there is both an ability and intent to repay. *Id.* at 426. Representation by implication is required because at the time of the transaction, there is usually no personal contact between the cardholder and credit card company. *Id.* The ability-implying prong of the doctrine essentially provides that with each use of the card the cardholder *guarantees* his ability to pay that debt. *In re Ford,* 186 B.R. 312, 317 (Bankr.N.D.Ga.1995). Therefore, "the doctrine suggests that a breach of that

duty ... will present sufficient grounds for denying a debtor his discharge." *Id.* The theory provides no room for any hope on the part of a debtor that his financial situation will improve and that he may at a later date have the ability to repay.

The second theory, referred to as the "assumption of the risk" theory, holds that the cardholder, by just using the credit card, does not make any representations to the issuer. *Kitzmiller,* 206 B.R. at 424. Under this theory, the charges are dischargeable unless made after the card is revoked. *Id.* The issuer, therefore assumes the risk that the cardholder will incur more debts than it is possible to repay. When this theory is applied, all pre-revocation charges are discharged regardless of the debtor's intent. A creditor is thus left with little or no recourse even when fraud is apparent. *Valdes,* 188 B.R. at 536–537.

The third theory, "totality of the circumstances," also requires a fictitious implication of intent not to repay. However, unlike the implied representation theory, in which debts are nondischargeable if the debtor is aware of its inability to pay when debt is incurred, the totality of the circumstances theory requires the creditor prove actual fraud through a pattern of "facts and circumstances ... [that] present a deceptive pattern." *Kitzmiller,* 206 B.R. at 424. Though, totality of the circumstances does not include the ability of the debtor to pay at the time charges were made, the Court may consider the debtor's own concept of his ability to pay only "to the extent that such lack of ability could lead the Court to infer that the Debtors did not intend to repay the debt because it would be financially impossible." *Id* at 427. This Court adopts the totality of the circumstances theory. As the Court in *Kitzmiller* found, the "totality of the circumstances" represents a balance of general principles of historical fraud with modern credit card charges.[2]

Under the totality of the circumstances test, the following factors should be considered when attempting to discern if the debtor did not intend to repay.

1. The length of time between the charges made and the filing of the bankruptcy.

2. Whether or not an attorney had been consulted before the charges were made.

3. The number of charges made.

4. The amount of the charges.

5. The debtor's concept of his ability to repay.

6. Whether the charges were above the credit limit.

7. Whether multiple charges were made on the same day.

8. Whether the debtor was employed.

9. Debtor's prospects for employment.

10. The financial sophistication of the debtor.

11. Whether there was a sudden change in the debtor's buying habits.

---

**2.** In addition to the policy concerns of adopting the implied representation theory, the Court finds that such theory does not comport with the plain language of §§ 523(a)(2)(A) and (B). Any representation as to the ability to repay is a statement respecting the debtor's "financial condition" and is not actionable under § 523(a)(2)(A). *See Kitzmiller* 206 B.R. at 426 (citing *Chemical Bank v. Sigrist,* 163 B.R. 940 (Bankr.W.D.N.Y.1994)). A false statement respecting a debtor's financial condition must be in writing and any nondischargeability action based on that statement must be brought pursuant to § 523(a)(2)(B).

12. Whether the purchases were made for necessities or luxury goods.

*Kitzmiller,* 206 B.R. at 427.

The facts in this case support a finding that Debtors intended to repay the debt and did not intend to deceive Universal. Though the charges on the Universal card were made within three months from the date the Debtors filed bankruptcy, the Debtors did not consult a lawyer until August of 2000, after they contacted a credit counseling service. Further, even after consulting a lawyer, Ms. Howard had to be persuaded not to reaffirm some of the unsecured debts. Though 29 purchases were made on the card, a majority of the purchases were small in size and apparently for necessities.

■ In addition, though the Debtors were unemployed at the time they were incurring debt on the Universal card, the Debtors expected that Mr. Howard would return to work soon. It would generally take Mr. Howard, at the most, two weeks to find employment after leaving a job. Mr. Howard testified, and there was no evidence offered to the contrary, that throughout the twelve calendar quarters of the years 1997, 1998 and 1999 Mr. Howard had gainful full time employment. It is obvious to the Court that the Debtors expected the trend of minimal time between jobs to continue.[3]

The Debtors in this case suffered a series of financial set-backs which is so commonly the reason that debtors seek bankruptcy relief. Ms. Howard testified that prior to March of 2000 she had never been late on any payments to any creditors. The record further indicates that the Debtors even attempted to save money and invest for their future. Debtors were relying on their investment in stock, which at one point had a value in excess of $10,000, as insurance for hard times. Unfortunately, the Debtor's investment lost nearly all of its value within the same time that Mr. Howard was unable to find a new draftsman position. The Debtor's had also bought a second home just days prior to Mr. Howard losing his job. It was this string of events that led to the Debtors bankruptcy.

The Court finds that the Debtors were merely taking advantage of the credit offered to them by Universal to try to weather their financial difficulties while Mr. Howard was between jobs. Universal has failed to prove that it was anything other than the intent of the Debtors to repay their debt to Universal. Because there was no misrepresentation of an intent to repay, this Court need not reach the other elements necessary to prove an action under 11 U.S.C. § 523(a)(2)(A). It is accordingly,

**ORDERED** that the debt owed to Universal Bank is **DISCHARGED.**

■

---

**3.** Though Universal argued on numerous occasions that Debtors also misstated Mr. Howard's income on the credit card application, as discussed in note 2 above, the misstatement can not serve as a basis for nondischargeability under section 523(a)(2)(A). Regardless, the Court finds that the Debtors anticipated that Mr. Howard would find employment soon after the application was submitted.