In re Mark Allen **BRANCH**, Debtor.

**FCC NATIONAL BANK**, Plaintiff,

v.

Mark Allen **BRANCH**, Defendant.

Bankruptcy No. 93–20215–C.
Adv. No. 93–2029–C.

United States Bankruptcy Court,
W.D. Missouri,
Central Division.

Sept. 24, 1993.

Jean Feather, Goller & Associates, Jefferson City, MO, for plaintiff.

Gary W. Smith, Sedalia, MO, for debtor/defendant.

## MEMORANDUM OPINION

FRANK W. KOGER, Chief Judge.

Debtor filed his petition for relief under Chapter 7 in this Court on or about March 25, 1993. Among the debts listed was an obligation to the FCC National Bank for $5,920.04. This debt was credit card incurred and was comprised of $550.00 for cash advances and $5,325.04 for purchases of goods and services, $30.00 for over limit fees and $15.00 for late payment fees. FCC National Bank (hereinafter FCC) duly filed its adversary action to determine the dischargeability of its obligation to it.

FCC's allegations sounded in 11 U.S.C. § 523(a)(2)(A). Hearing was actually held on September 15, 1993, and evidence adduced at that time. From the evidence adduced it appeared that debtor had applied for the credit card in September of 1992. At that time he was employed in California at the Sterling Ranch at what he said was a salary of $500.00 per week. By the time the debtor received the credit card, which apparently was about October 15, 1992, debtor had lost his job with the Sterling Ranch and was unemployed. He attempted to regain employment with an organization known as "Thieves Market" a western wear clothing store where he had worked in 1989 and 1990, but they were not willing to employ him.

Nothing daunted, debtor started charging on October 16, 1992, using his new credit card with the $5,000.00 limit even though he had no employment. From the date of October 16th through the date of October 29th, 1992, he charged $5,021.86. Thus, on November 18, 1992, when the first billing statement went out, debtor had already overrun his credit limit of $5,000.00. The next billing period ended on December 18, 1992, and in that period debtor had not incurred any new charges, but he had not made the minimum payment of $115.00 due from the 11–18–92 statement. On the January 18, 1993, billing date statement, debtor had charged an additional $567.08, but again had made no payments. Each of these new charges was below the merchant's floor limit. Finally, by the billing date of February 18, 1993, debtor had made one additional charge of $15.00 and had his outstanding balance up to the $5,920.04 previously set out. While debtor was incurring the charges from December 18th to January 18th and from January 18th to February 18th, he was employed here in Missouri for a convenience store and gas station. He was compensated at $5.00 per hour.

In addition to the charges made on this card, debtor at all times had regular monthly payments on two motor vehicles for which he and his wife were responsible, a

GM card on which he owed $250.00 and a Citibank Mastercard on which he owed some $2,000.00. While in California the rent on his apartment which he had shared with his wife was $800.00 per month. During the time he was using the FCC National Bank card in October (and thereafter) he was apparently separated from his wife because she was in Missouri and he was in California. When he came back to Missouri in late December, 1992, or early January, 1993, they did not resume cohabitation. He was divorced before filing bankruptcy.

At the time he filed his petition in March of 1993, he was working for the 50–Plus Pharmacy in Sedalia, Missouri, with a gross monthly pay of $537.42. His take home was $457.99. Finally, debtor's schedules reveal that in addition to the debts debtor was asked about and testified about, he also owed the Bank of America $500.00 for a cash advance from February of 1992, as well as owing the First Card out of Elgin, Illinois $4,471.86 on a credit card. He also owed Great Western Bank in Northridge, California, $1,070.00 for what he calls "household miscellaneous" on his schedules, Norwest Bank in Cordova, California, $2,820.00 for what again is identified as "household miscellaneous", Unocal for gasoline purchases on credit card in the amount of $1,030.00, Texaco on gasoline purchases on credit card in the amount of $331.00 as well as the usual household bills to Sears, Montgomery Ward and other clothing and general merchandise dispensers.

11 U.S.C. § 523(a)(2)(A) is applicable to an extension of credit induced by fraudulent behavior but which is not in connection with a written statement of financial condition. A cause of action under this section may be established by proving:

(1) That the debtor made false representations;

(2) At the time made, the debtor knew them to be false;

(3) That the representations were made with the intention and purpose of deceiving the creditor;

(4) That the creditor relied on the representations; (in the 8th Circuit reason-able is not included in the requirement). See *In re Ophaug*, 827 F.2d 340 (8th Cir.1987).

(5) That the creditor sustained the alleged injury as a proximate result of the representations having been made.

Clearly when a consumer uses a bank credit card to make a purchase, the consumer makes no explicit representation to anyone, certainly not to the third party issuer who is far removed, at least geographically, from the purchase transaction.

However, two separate lines of cases have evolved to deal with this unique type of transaction. The majority of Bankruptcy Courts have held that the act of using the credit card, by itself, carries two implied representations: (1) that the debtor has the intent to repay the credit card debt; and (2) that the debtor has the ability to repay the debt. See, for example, *Citicorp Credit Services, Inc. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bkrtcy. D.N.D.1990); *Manufacturers Hanover Trust Company v. Cirineo (In re Cirineo)*, 110 B.R. 754, 758 (Bkrtcy.E.D.Pa. 1990); *Norwest Bank v. Stewart (In re Stewart)*, 91 B.R. 489, 494 (Bkrtcy. S.D.Iowa 1988); and cases of similar nature. Thus, the debtor who is without ability to pay at the time a credit card purchase is made or a cash advance is obtained and knows he does not have the ability or is reckless about whether he has the ability, has made the required false representations and has the required intent to deceive the creditor. This majority line of cases, along with facts supporting debtor's knowledge or recklessness with regard to ability to repay, will enable the creditor to surmount the hurdle of proving the first three elements outlined above. The creditor must then prove reliance on the implied representations and that creditor was harmed by such reliance. The Court hastens to note that in the Eighth Circuit at least there is good authority for indicating that the creditor need not prove reasonable reliance as it probably needs to do in other circuits, but only an actual reliance which apparently should not be too unreasonable. *In re Ophaug*, 827 F.2d 340 (8th Cir.1987).

The Court is not oblivious to the second line of cases regarding credit card charges under 11 U.S.C. § 523(a)(2). Stated most simply, they proceed on an "assumption of the risk" basis. The most frequently cited example of this line is *First National Bank v. Roddenberry*, 701 F.2d 927 (11th Cir.1983). Therein the Eleventh Circuit held that any and all charges, incurred after the fact of revocation of a card by the issuer is communicated to the debtor, are nondischargeable. Unfortunately, that case is repeatedly cited for the converse, i.e., "that all charges incurred before communication of revocation are dischargeable." Actually the Court recognized that the underlying facts in any case needed to be analyzed carefully to determine if there had been fraud. Further the Court specifically recognized the many differences between credit practices in 1940 that led to the forerunner of *Roddenberry*. Also, *Roddenberry* is a pre-code case and was controlled by § 17 of the 1898 Act. Finally, the Court reversed the lower courts which had allowed almost total discharge and remanded to the Bankruptcy Court for further analysis. Nevertheless, many courts have followed what is advertized to be the *Roddenberry* standard. Somehow to this Court that is analogous to the merchant who sells someone a gun and then is told he cannot complain if the buyer uses the gun to rob him at gun point.

In the instant case, the debtor's charging of over $5,000.00 (which was over the debtor's credit limit) within one month of receipt of the card, all while he was unemployed and had no means of support, indicate the recklessness and willfulness of the debtor. There is absolutely no indication how the debtor would or could be able to repay any of the funds advanced. Further, in January of 1993, debtor again used the card. By this time he was working for $5.00 an hour, owed over $5,000.00 on the card as well as the thousands of dollars that he otherwise owed, and his wife and he were in the process of obtaining a dissolution of their marriage relationship. It is impossible for this Court to believe that debtor thought he could repay or intended to repay when he incurred these latter charges. In fact, this Court finds that debtor had neither the intent nor the ability to repay his charges as he made them and was fully cognizant of his inability and his intent. The Court likewise finds that debtor knew he could not pay and lacked the intent to pay during his October charging orgasm.

For all of the reasons stated herein and for the reasons advanced by the Court at the conclusion of trial, the Court rules that the debt of this debtor to FCC National Bank is NOT DISCHARGEABLE under 11 U.S.C. § 523(a)(2)(A).

The foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required under Rule 7052, Rules of Bankruptcy.

SO ORDERED.