**In re David M. BRIESE and Noreen K. Briese, Debtors.**

**CHEVY CHASE BANK, FSB, Plaintiff,**

v.

**David M. BRIESE and Noreen K. Briese, Defendants.**

Bankruptcy No. 95–10989–7.
Adv. No. A95–1116–7.

United States Bankruptcy Court,
W.D. Wisconsin.

May 6, 1996.

Randi L. Osberg, Garvey, Anderson, Johnson, Gabler & Geraci, Eau Claire, WI, for Plaintiff.

James T. Remington, New Richmond, WI, for Defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

On March 4, 1996, the Court held a trial on the plaintiff's complaint to determine the dis-

chargeability of a debt under 11 U.S.C. § 523(a)(2)(A). The plaintiff, Chevy Chase Bank, FSB, is an issuer of credit cards, and seeks to except from discharge its claim on a card issued to the debtors, David and Noreen Briese. The plaintiff contends that the debt should be determined nondischargeable on the grounds that the debtors falsely represented their intent to pay for a number of cash advances Mrs. Briese obtained with the card. The debtors are represented by James T. Remington, while the plaintiff is represented by Randi L. Osberg.

Lured by the availability of easy credit and the promise of easy money, the debtors in this case found themselves trapped between a modern-day version of Scylla and Charybdis, the mythical sea monsters encountered by Homer's Odysseus.[1] For these debtors, such monstrous images undoubtedly personify both the consumer credit industry and legalized gambling. The growth recorded over recent years by these twin titans has been phenomenal,[2] and as they have grown

they have become intertwined. Indeed, this case is a painful demonstration of how insidiously easy it is to utilize credit cards to finance one's turn at the tables.[3] The question for the Court is whether the credit card debts Mrs. Briese incurred to fuel her gambling fever were obtained in a manner proscribed by 11 U.S.C. § 523(a)(2)(A).

The facts are as follows. David Briese is a machinist, and has worked for the same employer for a number of years. He is a high school graduate and completed the two years of vocational school necessary for his position. He earns approximately $30,000.00 per year. Noreen, his wife of almost 14 years, works part-time as a nurse's aide and earns about $16,000.00 per year. They have five children, ranging in ages from three to 13. In the past, Mr. Briese paid all the household expenses from his salary. Mrs. Briese's paycheck was to use as she chose. Unfortunately for all involved, she chose to use it to fund her gambling habit.[4]

1. In Homer's Odyssey, the classic Greek tale of a hero returning home from the battle of Troy, Odysseus and his men must battle numerous monsters and overcome seemingly insurmountable obstacles in the course of their journey. Scylla, a multi-headed monster, and Charybdis, a creature whose daily consumption of the sea apparently created a whirlpool, were among the terrors faced during the voyage. As these creatures lived upon opposite shores of a very narrow strait, it was virtually impossible to navigate away from one without falling into the clutches of the other. Hence the phrase, "trapped between Scylla and Charybdis," wherein one is caught between two equal difficulties.

2. Legalized gambling has mushroomed in the past fifteen years. Just ten years ago, only two states—Nevada and New Jersey—permitted casinos. Now 27 states authorize such enterprises, often on top of parimutuel racing, dog tracks, and lotteries. See "America's Gambling Fever," U.S. News. & World Report, January 15, 1996, at 53. Americans wagered $482 billion in 1994, 85% of that at casinos. As tourist attractions, casinos rank behind only amusement parks in total attendance; 146 million people visited the top 50 amusement parks in 1994, compared to 125 million visitors at casinos, approximately 70 million at baseball games, 24 million at symphony concerts, and 14 million at NFL games. Id.; see also "No Dice: The Backlash Against Gambling," Time, April 1, 1996, at 29.

The credit card business has also been incredibly profitable, leading to increased competition and the proliferation of "plastic." For the first

time in history, consumers owe more than $1 trillion on non-mortgage installment credit, with nearly $400 billion of that debt on credit cards. See "Lenders Worry That Consumers Cannot Afford Increased Debt," 28 Bankruptcy Court Decisions No. 8, at A8 (January 30, 1996). There are approximately 460 million credit cards presently in circulation in this country, issued by over 9000 different "banks" (many, like AT & T Universal Bank, are banks in name only). The average card has a continuing balance of $1,800.00, while the average family has about $3,000.00 in credit card debt. See "House of Cards," Consumer Reports, January 1996, at 31. In the never-ending quest for new customers, the credit card industry's newest tactic is the "pre-approved" credit card solicitation, which offers high credit lines and low "teaser" rates to entice consumers. Over 2.4 billion of such solicitations were sent out last year alone. Id.

3. Rare indeed is the gambler who must leave the tables to find a local pawn shop and hawk a few more precious possessions. As one recent article indicated, "[i]t's easy to use the automated teller machines ... or to open a line of credit [at the casino]." "America's Gambling Fever," U.S. News & World Report, January 15, 1996, at 58.

4. Mrs. Briese testified that she has sought assistance with her gambling problem by attending Gamblers' Anonymous meetings and visiting a counselor. However, Mr. Briese indicated that he was not certain his wife had completely abandoned her visits to the casino. The operation of the debtors' household finances also does not

If Mrs. Briese had funnelled only her own money into the "one-armed bandits" and other games of chance, the debtors likely would not be before this Court. However, she also obtained numerous cash advances on a variety of credit cards, virtually all of which she spent at the casino. By the fall of 1994, she had incurred approximately $30,000.00 in unsecured credit card debt.[5] She was paying approximately $800.00 per month, or well over half of her gross monthly paycheck, simply to make the minimum payments on these debts. When she reached the credit ceiling on a particular card, she would destroy it; her testimony was that she had destroyed most of her credit cards long before the bankruptcy filing. It does not appear that she ever went over her credit limit on any card, and she was in fact current on her credit card payments as of the petition date.

According to Michael J. Miele, a representative of the plaintiff, the relationship between the parties began that fateful fall of 1994. In September of that year, Chevy Chase Bank requested credit information from Equifax, one of the nation's largest providers of credit reporting services. Like virtually all credit card companies, the plaintiff desired to expand its customer base. What it sought from Equifax was a listing of potential customers who fit the desired profile and fell within a certain range of credit history "scores." Essentially, the plaintiff wanted likely targets for its credit card solicitations. The debtors' names were among the thousands forwarded to the plaintiff from Equifax.

Thereafter, the plaintiff sent the debtors a "pre-approved" credit card solicitation promising them a credit line "up to $10,000.00." Since Mrs. Briese had "maxed out" nearly all of her other cards, she and her husband signed the form and returned it to the plaintiff. Thereafter, the plaintiff conducted a credit check on the debtors. The testimony of Mr. Miele was most instructive in this regard. He acknowledged that the plaintiff knew the debtors had a debt-to-income ratio of 66% (in other words, their unsecured debts exceeded ⅔ of their annual income). The credit report obtained by the plaintiff also provided numerous details regarding the debtors' past credit history, including their history of timely payment and the fact that they typically carried large outstanding balances on their credit cards.

After conducting this credit check, the plaintiff issued a credit card to the debtors with a credit line of $11,500.00.[6] Initially, the plaintiff placed a $3,450.00 cap on cash advances the debtors could receive, although this limit was ultimately raised to $11,500.00 as well.[7] Mrs. Briese testified that she was "surprised" to receive such a generous credit allotment, especially since several other lenders had only recently rejected her applications. However, she was nonetheless quite happy to get the card, as she was just entering the most destructive phase of her gambling addiction and never had enough money

appear to have altered significantly, although Mr. Briese testified they now have a joint account into which both paychecks are deposited.

**5.** The testimony at trial indicated that Mrs. Briese incurred virtually all of the debtors' credit card debt alone. Mr. Briese testified that he carried a credit card but never used it. According to Mrs. Briese, she may have occasionally used the card for presents or school clothes, but the overwhelming bulk of the debt was for gambling money.

**6.** The debtors apparently never had a credit card with a line of credit greater than $5,000.00 before they received the plaintiff's card. Despite this fact, the plaintiff issued them a card with a credit line which not only doubled the credit available to them on any other card, but which also exceeded the amount described in the solici-

tation. Mr. Miele explained that the debtors' past payment history justified this credit increase. However, as debtors' counsel suggested in argument, it is unclear exactly how a history of making little more than minimum payments can account for the extension of such large sums of credit, unless the creditor's goal is simply to perpetuate the existence of large balances subject to inflated interest rates.

**7.** The circumstances surrounding this increase are vague. Mrs. Briese testified that she was at the casino, attempted to get a cash advance at the teller window, and was turned down because she had reached her advance limit. On a subsequent attempt (allegedly at the teller's prompting), she apparently was able to get the advance. The plaintiff contests the accuracy of this story, but it is uncontested that the debtors' cash advance limit was raised to match their credit line.

to spend. During this period of time, it seems she spent every available moment, and every available dollar, at the casino.

Mrs. Briese's work schedule was ideally suited to her addiction. As a nurse's aide, she would work just five days in a two-week period. Her youngest child was in day care and her older children were in school. Consequently, without anyone to monitor her activities she could gamble away her days off. Prior to the fall of 1994, she worked a shift which ended at about two o'clock in the afternoon; as a result, she could not visit the casino on the days she worked because she had to be home to greet her husband and children. That fall, however, she switched to a shift that ended at about eleven o'clock at night. Since her husband and children were asleep she often went gambling after work, sometimes returning home at dawn. Apparently, her credit cards financed these late-night escapades. In its rush to increase profits, the plaintiff gave her yet another opportunity to wager more borrowed money at the same time her schedule granted her the time necessary to do so.

Given the frequency of her trips to the casino, it is perhaps unsurprising that Mrs. Briese intermittently beat the odds and actually won sizeable sums of money. In the years prior to 1995, this had never amounted to more than $5,400.00; however, in February of 1995 she won two jackpots totalling approximately $33,000.00. She testified that it was only *after* she won these jackpots that she actually calculated her entire credit card debt and realized how deep in the hole she really was. After payment of income taxes, the debtors paid a couple of unsecured creditors and made a few improvements to their home. This left approximately $15,000.00, which Mrs. Briese took to the casino in an unproductive attempt to make enough to pay off all her credit card debt.[8]

After Mrs. Briese lost her "winnings," the debtors decided to file bankruptcy because of their large credit card bills, on which they could make little more than minimum payments. They filed for relief under chapter 7 of the bankruptcy code and scheduled a number of credit card companies, including the plaintiff, among their unsecured creditors. The plaintiff now seeks to have its claim against them declared nondischargeable under 11 U.S.C. § 523(a)(2)(A), contending that by her use of the credit card in the months prior to the bankruptcy filing, Mrs. Briese obtained credit totalling $7,811.05 through "false pretenses, a false representation, or actual fraud."

The purpose of the bankruptcy code is to permit debtors to "reorganize their financial affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (citations omitted). However, this fresh start is available only to the "honest but unfortunate debtor." *Id.,* 498 U.S. at 287, 111 S.Ct. at 659. Section 523(a)(2)(A) is among those provisions of the bankruptcy code which sift the chaff from the wheat, so to speak—it prohibits the discharge of those debts incurred through fraud, thus limiting the fresh start of the dishonest debtor. However, like all exceptions to discharge, it is to be narrowly construed in favor of the debtor. *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir.1994); *Matter of Ford,* 186 B.R. 312, 316 (Bankr.N.D.Ga.1995); *In re Friend,* 156 B.R. 257, 260 (Bankr.W.D.Mo.1993); 3 Lawrence P. King, et al., *Collier on Bankruptcy,* ¶ 523.05C, at 523–20 (15th ed. 1996).

The creditor has the burden of establishing nondischargeability by a preponderance of the evidence. *Grogan,* 498 U.S. at 287, 111 S.Ct. at 659. The Seventh Circuit

---

8. It is entirely possible to simply shake one's head at the foolishness of this return trip. Even though she could not make full payment on her debts, she could have made a sizeable dent with the $15,000.00. Still, to chide Mrs. Briese too strongly for this folly is to ignore the mentality of the true gambling addict, to whom no amount is ever enough and who always believes that the lucky streak will continue. Compulsive gambling often leads to divorce, lost employment, embezzlement, and even suicide. See "No Dice: The Backlash Against Gambling," *Time,* April 1, 1996, at 33; "America's Gambling Fever," *U.S. News & World Report,* January 15, 1996, at 59. As one gambler put it, "Casinos are the crack cocaine of gambling." *Id.*

has articulated the elements of an action under § 523(a)(2)(A) as follows:

> [t]o succeed on a claim that a debt is nondischargeable under section 523(a)(2)(A), a creditor must prove three elements. First, the creditor must prove that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Carini v. Matera,* 592 F.2d 378, 380 (7th Cir.1979). The creditor also must prove that the debtor possessed scienter, i.e., an intent to deceive. *Gabellini v. Rega,* 724 F.2d 579, 581 (7th Cir.1984). Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable.

*In re Kimzey,* 761 F.2d 421, 423–24 (7th Cir.1985). Thus, a creditor must combine three ingredients to succeed under § 523(a)(2)(A)—falsity, fraudulent intent, and reliance. *Matter of Mayer,* 51 F.3d 670, 674 (7th Cir.1995).[9]

■ Bankruptcy courts have long struggled with application of these requirements to cases involving the alleged fraudulent use of a credit card. The initial conceptual problem is that there is no "face-to-face" contact between the credit card issuer and the debtor. For example, in this case the debtors never met or even spoke with anyone associated with the plaintiff. Further, when Mrs. Briese used the card, she presented the card to the "bank" at the casino, not the plaintiff.[10] As "the cardholder and [card issuer] have no personal contact ... the cardholder cannot be said to have directly represented anything to the issuing bank [and] the bank has nothing upon which to base an act of reliance."

*Ford,* 186 B.R. at 317; *see also In re Branch,* 158 B.R. 475, 477 (Bankr.W.D.Mo.1993) ("[T]he [cardholder] makes no explicit representation to anyone, certainly not to the third party issuer who is far removed, at least geographically, from the purchase transaction.").

■ In response to this perceived conceptual dilemma, courts "have come to modify the way in which the elements of section 523(a)(2)(A) proof are met in credit card situations." *In re Hinman,* 120 B.R. 1018, 1021 (Bankr.D.N.D.1990). Almost without considering whether this "modification" of the law was appropriate absent congressional action, in the past decade and a half courts have crafted several theories to support nondischargeability judgments in credit card cases. The majority of these courts have resolved the "problem" by adopting what has been called the "implied representation" theory. Under this approach, the use of a credit card is an implied representation that the holder has both the intent and the ability to pay the issuer for the charged purchases and advances. *See In re Murphy,* 190 B.R. 327, 331 (Bankr.N.D.Ill.1995). As one court stated:

> the act of using the credit card, *by itself,* carries two implied representations: (1) that the debtor has the intent to repay the credit card debt; and (2) that the debtor has the ability to repay the debt ... [t]hus, the debtor who is without ability to pay at the time a credit card purchase is made or a cash advance is obtained and knows he does not have the ability or is reckless about whether he has the ability, has made the required false representations and has the required intent to deceive the creditor.

in *Mayer* remain constant, though the standards by which they are judged may shift. *Mayer,* 51 F.3d at 675–76.

9. It must be noted that *Kimzey* has come under some criticism. For example, it also held that a creditor must prove the statutory elements by clear and convincing evidence, a standard disapproved by the Supreme Court in *Grogan.* Similarly, the requirement of "reasonable reliance" was questioned by the Seventh Circuit in *Mayer,* 51 F.3d at 675, and ultimately repudiated in favor of a "justifiable reliance" standard by the Supreme Court in *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Nonetheless, the essential requirements as articulated

10. For its customers' "convenience," the casino featured not only ATM machines (from which customers could withdraw limited amounts, up to about $200.00 per day) but also a teller window. By utilizing her credit card at this window, Mrs. Briese could receive "Cash & Win" checks in any amount up to her credit limit.

*Branch,* 158 B.R. at 477. [Emphasis added].[11]

■ Another view, the so-called "assumption of the risk" approach, is based upon the decision in *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). This theory presupposes that credit card transactions inherently possess an element of risk—namely, that the cardholder will exceed the card's credit limit. Given that the issuer voluntarily assumes this risk, there is no basis to deny discharge of those debts incurred *before* the issuer notifies the cardholder that it is revoking the cardholder's right to use the card. *Id.* at 932. Charges made thereafter constitute debts created by "false pretenses or false representations" because such purchases amount to an "affirmative representation that one is entitled to possess and use the card." *Id.; see also In re Eashai,* 167 B.R. 181, 184 (9th Cir. BAP 1994).[12]

■ Yet another line of cases purportedly examines the "totality of the circumstances" to determine whether the debt should be discharged. A leading case which discusses this concept is *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988). Under this approach, the court should apply a list of factors to the debtor's situation and, in essence, mix and match to see if the debt should be discharged. The list of factors is commonly expressed as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney was consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges were made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits;

12. Whether the purchases were made for luxuries or necessities.

84 B.R. at 657; *see also In re Troutman,* 170 B.R. 156, 157 (Bankr.D.Neb.1994); *In re Eashai,* 167 B.R. 181 (9th Cir. BAP 1994); *In re Holmes,* 169 B.R. 186 (Bankr.W.D.Mo. 1994); *In re Orndorff,* 162 B.R. 886 (Bankr. N.D.Okla.1994).[13]

Though their rhetoric may indicate otherwise, in reality there is a good deal of overlap between these theories. A number of the "implied representation" courts rely on the "twelve factors" of *Dougherty* to ascertain

---

**11.** *See also In re Holmes,* 169 B.R. 186, 190 (Bankr.W.D.Mo.1994); *In re Pursley,* 158 B.R. 664, 668 (Bankr.N.D.Ohio 1993); *In re Friend,* 156 B.R. 257, 260–61 (Bankr.W.D.Mo.1993); *In re Vermillion,* 136 B.R. 225, 226 (Bankr.W.D.Mo. 1992).

**12.** *Roddenberry* was decided under section 17a(2) of the Bankruptcy Act of 1898, the predecessor of the present bankruptcy code. Section 17a(2) excepted from discharge debts created by "false pretenses or false representations." In the code, Congress specified "actual fraud" as an additional ground for nondischargeability. It appears that even those courts bound by *Roddenberry* have latched onto the phrase "actual fraud" as a basis for circumventing the pure "assumption of the risk" concept. *See Ford,* 186 B.R. at 319. The test adopted by these courts is essentially a reconstruction of the "implied representation" analysis. *Id.*

**13.** It should be noted that the Bankruptcy Appellate Panel in *Eashai* stressed that these factors are *not* exclusive:

> *Dougherty* does not stand for the proposition that these factors create a type of "constructive fraud" that is nondischargeable ... [t]he factors do not constitute a singular formula; they were stated to provide a guide for evidence of an inferential nature which may be considered by the court in evaluating the actual intent of the debtor at the time the card was used. 167 B.R. at 184. A similar set of objective factors was cited with approval by the court in *In re Schnore,* 13 B.R. 249 (Bankr.W.D.Wis.1981), and discussed at length by debtors' counsel in this case. Given recent developments in this area, however, the Court finds it unnecessary to resort to mechanical consideration of such objective criteria when ascertaining whether the debtor acted with "scienter," or intent to deceive, as mandated by *Kimzey* and *Mayer.*

the debtor's intent. *See Holmes,* 169 B.R. at 190; *Friend,* 156 B.R. at 261. Similarly, the "totality of the circumstances" courts often adopt the "assumption of the risk" concept to the extent the charges in question were incurred *after* card privileges were revoked. *See Troutman,* 170 B.R. at 157. Finally, the "assumption of the risk" courts have adopted an analysis of the phrase "actual fraud" in § 523(a)(2)(A) which ignores the *Roddenberry* holding and essentially adopts the "implied representation" theory. *See Ford,* 186 B.R. at 319. These shifting boundaries have led some to contend that the courts are waging nothing more than a war of words over distinctions which have no substantive difference. *See, e.g.,* Drew Frackowiak, *The Fallacy of Conflicting Theories For Analyzing Credit Card Fraud Under 11 USC Section 523(a)(2)(A),* 4 J.Bankr.L. & Prac. 641, 652–53 (September/October 1995).

Regardless, navigating the uncertain waters of credit card fraud with these conceptual models as a compass is a tricky proposition. In recent months courts have recognized the judicial conflict on the issue and are in the process of re-assessing these various theories, in part because of the Supreme Court's decision in *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The emerging consensus appears to be that none of the approaches fully explains or resolves the issue of a debtor's fraudulent use (or abuse) of a credit card. *See, e.g., In re Alvi,* 191 B.R. 724 (Bankr.N.D.Ill.1996); *In Re Murphy,* 190 B.R. 327 (Bankr.N.D.Ill.1995); *Matter of Ford,* 186 B.R. 312 (Bankr. N.D.Ga.1995); *In re Cox,* 182 B.R. 626 (Bankr.D.Mass.1995).

There are several troubling aspects to each approach. One problem faced by the "implied representation" school and, to a lesser extent, the "totality of the circumstances" cases as well, is the risk that the debtor in essence becomes the "guarantor" of his or her financial condition. For example, the leading proponent of the "twelve factors" analysis, the Ninth Circuit Bankruptcy Appellate Panel, cautions:

[c]are must be taken to stop short of a rule that would make every desperate, finan-cially strapped debtor a guarantor of his ability to repay, on pain of nondischargeability. Such a rule would unduly expand the "actual fraud" discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting nondischarge.

*Eashai,* 167 B.R. at 185 (*quoting In re Karelin,* 109 B.R. 943, 947–48 (9th Cir. BAP 1990)). While the *Eashai* court believed that its "totality of the circumstances" test was the most appropriate, it also acknowledged the chief problem with the approach—that courts could come to treat the factors as a "singular formula" or a litmus test for fraud, rather than nonexclusive factual considerations. 167 B.R. at 184.

To establish a system which makes the debtor an absolute guarantor of his or her ability to repay "offends the balance of bankruptcy policy struck by section 523." *Ford,* 186 B.R. at 317. Most courts appear to examine a debtor's "ability" to repay on an objective basis, focusing on "the debtor's insolvency in either the bankruptcy sense (excess of liabilities over assets) or the equity sense (inability to pay debts as they mature)." *Cox,* 182 B.R. at 633. However, this approach does not consider the reality of the consumer credit marketplace, where people use credit cards *precisely because they do not have a present ability to pay. Ford,* 186 B.R. at 317; *see also In re Carpenter,* 53 B.R. 724, 728 (Bankr.N.D.Ga.1985). It is exactly this reality which makes the credit card industry so profitable, and it is why credit card companies often advertise their cards as just the thing to use in an "emergency." *See Friend,* 156 B.R. at 261 n. 2 (credit card and related checks for "expenses that hit you out of nowhere"). Further, although the minimum monthly payments are often the only relevant concern for cash-strapped consumers, courts rarely concern themselves with the debtor's ability to make those payments. *Cox,* 182 B.R. at 633.

Another problem is that the use of these implied representations gives credit card

creditors an advantage over normal creditors, who bear the burden of establishing each and every element of a nondischargeability claim. *Ford,* 186 B.R. at 317; *see also In re Faulk,* 69 B.R. 743, 753 (Bankr. N.D.Ind.1986). For example, according to one court the "implied representations" of ability and intent to repay, together with evidence regarding the debtor's purported "knowledge or recklessness" is sufficient to "surmount the hurdle" of essential elements of a § 523(a)(2)(A) claim. *Branch,* 158 B.R. at 477. Nothing in the bankruptcy code authorizes such preferential treatment for credit card companies. Debtors do not commit fraud just by using their credit cards, even when they are heavily in debt. *In re Bonnifield,* 154 B.R. 743, 745 (Bankr. N.D.Cal.1993). To permit credit card plaintiffs to benefit from "implications" is to engage in impermissible burden-shifting.[14]

The "assumption of the risk" theory is also unsatisfactory, primarily because dishonest debtors may manipulate its mechanical distinction between debts incurred before and after credit privileges are revoked. *Eashai,* 167 B.R. at 184. It is quite possible that a debtor might intentionally defraud a credit card company, yet not exceed his credit limit or otherwise engage in behavior which would result in the revocation of card privileges. While the bankruptcy code is to be construed liberally in favor of the debtor, it is also to be fair to creditors. The creditor does not "assume the risk" that the debtor is dishonest. Rather, the credit card transaction (like any other lending relationship) is premised upon the notion that both parties will act in good faith. Thus, the debtor is expected to make "bona fide" use of the card and not engage in fraud. *Id.* at 185; *see also Cox,* 182 B.R. at 634 (assumption of risk theory is "too judgmental"); *In re Shanahan,* 151 B.R. 44, 47

(Bankr.W.D.N.Y.1993) (creditor does not assume risk of fraud).

Given the growing dissatisfaction with the current models for ascertaining the nondischargeability of credit card debt, the question arises whether there is an acceptable alternative. In *Field v. Mans, supra,* the Supreme Court determined that a creditor must prove "justifiable reliance" upon the debtor's fraudulent representation to succeed in an action under § 523(a)(2)(A). In the course of its discussion, the court stated that "[i]t is well established that '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms.' " —— U.S. at ——, 116 S.Ct. at 443, 133 L.Ed.2d at 361 (citations omitted). In drafting the 1978 bankruptcy code, Congress added "actual fraud" as an exception to discharge, and the court should look to the meaning of the phrase at common law when determining its application in the context of a claim under § 523(a)(2)(A). *Id.* at —— ——, 116 S.Ct. at 443–44, 133 L.Ed.2d at 361–62.[15]

*Field* thus neatly solves the struggle over conceptualizing credit card fraud. Quite simply, it directs the focus to the common law of fraud. At common law, a promise of future performance or intention is actionable as fraud if at the time the statement was made, the debtor never actually intended to honor the statement. *See Bay State Milling Co. v. Martin,* 916 F.2d 1221 (7th Cir.1990); *Hartwig v. Bitter,* 29 Wis.2d 653, 139 N.W.2d 644 (1966); *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267 (1965). *See also In re Murphy,* 190 B.R. 327, 332 (Bankr.

---

**14.** The *Cox* court suggests that some courts permit not only an "implied representation" of ability and intent to repay, *but also an inference that the debtor actually had no intention of repaying the charges.* 182 B.R. at 633. Such an inference clearly violates a fundamental precept of bankruptcy jurisprudence—that exceptions to discharge be narrowly construed in favor of the debtor. *Id.* at 635; *see also Ford,* 186 B.R. at 316.

**15.** Under section 17(a)(2) of the Bankruptcy Act of 1898, the predecessor of the present code, debts arising from "false pretenses or false representations" were excepted from discharge. When Congress added the phrase "actual fraud" to § 523(a)(2)(A), the purpose was to codify the existing case law, which "interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." *Cox,* 182 B.R. at 632 (*quoting* 124 Cong.Rec. H11,096 (daily ed. Sept. 28, 1978), S17412 (daily ed. October 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini)).

N.D.Ill.1995); Restatement (Second) of Torts (1976) § 530(1) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.").[16]

■ As to the ongoing concern regarding the lack of "face-to-face" contact between the debtor and the card issuer, it is unclear why this issue is such a conceptual hurdle. Although the debtor may not speak directly to the credit card issuer when making a purchase or obtaining a cash advance, there is little doubt that the debtor makes a representation—namely, the promise to pay for the credit advanced. One court recently expounded upon the broad scope of the concept of a "representation" as follows:

> "[r]epresentation" includes "statement," but can include other things as well. A "statement" means "a *detailed or explicit* communication," The Random House College Dictionary (rev. ed., Random House, Inc., 1975) (emphasis added), or "a *formal* written or oral account," The New Shorter Oxford English Dictionary (Clarendon Press: Oxford, 1993) (emphasis added). A "representation" may include "an *implication* or statement," or any "act" which accomplishes "presentation to the mind, as of an idea," The Random House College Dictionary, *supra* (emphasis added), or even "symbolic action," The New Shorter Oxford English Dictionary, *supra.*

*In re Peterson,* 182 B.R. 877, 880 (Bankr. N.D.Okla.1995). In Wisconsin, a person need not make an oral or written misrepresentation to be guilty of fraudulent conduct; such representations may also be made by acts or conduct. *Scandrett v. Greenhouse,* 244 Wis. 108, 11 N.W.2d 510 (1943). The Restatement (Second) of Torts also defines "representation" broadly. *See* Restatement (Second) of Torts § 525 cmt. b (misrepresentation includes not only written or spoken words "but also any other conduct that

amounts to an assertion not in accordance with the truth").

The combination of this definition of "representation" with the common law regarding fraudulent statements of future performance provides a satisfactory vehicle for dealing with the dischargeability of credit card debts. There is no longer a need to craft "legal fictions" under which the debtor purportedly makes various representations regarding ability or intent to pay. Nor is there the risk that the debtor becomes the guarantor of his or her financial condition. And finally, there is no inappropriate judicial favoritism of credit card issuers over other creditors. Although a representation is inherent in the transaction, the credit card company must still prove *all* of the remaining elements of § 523(a)(2)(A)—falsity, fraudulent intent, and reliance—without assistance in surmounting these "hurdles."

This approach to fraudulent representations can be examined by reference to Popeye's good friend Wimpy, who always promised, "I'll gladly pay you Tuesday" for a hamburger today. Wimpy is not guilty of fraud just because on Tuesday he doesn't have the money, or even if he was hopelessly insolvent when he made the promise. The common law notion of actual fraud requires that he have acted with an intent to deceive when he made the promise to pay; i.e., that when he told Popeye he would pay him back, he never intended to actually fork over the cash or otherwise acted recklessly. The situation is the same even if Popeye gives Wimpy a credit card to use in making the purchase. The act of using the card constitutes a "representation" or promise regarding Wimpy's future performance. *Murphy,* 190 B.R. at 332; *Peterson,* 182 B.R. at 880; *see also* Restatement (Second) of Torts § 525 cmt. f (a promise as to the future course of events "may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his predic-

---

**16.** *Murphy* disagrees with *Cox's* argument that the debtor's use of the card does not carry with it an "implied representation" of an intent to pay for the charges incurred. *Murphy,* 190 B.R. at 332 n. 6. However, the continued use of the phrase "implied representation" at any stage of an action under § 523(a)(2)(A) is inappropriate

because it is actual fraud, not implied or constructive fraud, which is the concern of § 523(a)(2)(A). *Ford,* 186 B.R. at 317–18 n. 7. In the credit card context, the debtor's use of the card constitutes an *actual* representation of future performance. That representation, if fraudulent, may justify an exception from discharge.

tion or promise impossible or improbable"). The same is true in the present case. By using their credit card, the debtors made a promise of future performance—they "represented" to the plaintiff that they would pay those charges in full. That promise is not actionable as fraud—or excepted from discharge under § 523(a)(2)(A)—unless the plaintiff can prove that they acted with an intent to deceive when they incurred the charges and made the representation. *Murphy,* 190 B.R. at 332.

It is of course difficult, if not impossible, for a plaintiff to present direct evidence of a debtor's intent to deceive. Rare indeed is the case in which the debtor broadcasts his intent to friends and neighbors, or writes a letter to his mother confessing the details of his plot to defraud his creditors. As a result, courts may legitimately utilize circumstantial evidence to ascertain the debtor's intent. The question is whether the Court should judge the debtor's intent on an objective or subjective standard. Under an objective standard, the court must inquire into the "reasonableness" of the debtor's representation, while a subjective standard focuses upon the debtor's state of mind at the time of the representation. *Murphy,* 190 B.R. at 332.

As *Murphy* indicates, many courts have blurred the lines between these standards, switching intermittently between objective and subjective examinations in the course of a single opinion. *Id.* at 333; *see also In re Berz,* 173 B.R. 159, 163 (Bankr.N.D.Ill.1994) (The court shifts from requiring that "debtor knew full well" his statements were fraudulent to whether "debtor had a reasonable belief in his intent and ability to repay the debt."). Others have clung solely to an objective approach, condemning debtors who "knew or should have known" they lacked the ability to repay the debts in question. *See In re Rouse,* 156 B.R. 314, 316 (Bankr. M.D.Fla.1993) (debtors had "no realistic basis" to believe they could pay off their credit card debt); *In re Stokes,* 155 B.R. 785, 787 (Bankr.M.D.Fla.1993) (a "realistic assessment" left no doubt debtors could not honestly believe they could have paid their debts); *In re Sparks,* 154 B.R. 766, 768 (W.D.Ala.

1993) (debtor "knew or should have known" he couldn't pay his credit card debts).

In many instances, however, there is likely to be quite a gulf between what the proverbial "reasonably prudent person" might consider appropriate and the actual mental state of a debtor teetering on the brink of bankruptcy. "Human experience tells us debtors can be unreasonably optimistic despite their financial circumstances." *Cox,* 182 B.R. at 635; *see also Eashai,* 167 B.R. at 185 (many debtors incur debts with hopes of repayment which are "unrealistic in hindsight"). The Seventh Circuit has held that a debt may be excepted from discharge under § 523(a)(2)(A) only when the debtor makes a statement he "either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation." *Mayer,* 51 F.3d at 675; *see also In the Matter of Sheridan,* 57 F.3d 627, 635 (7th Cir.1995). It is problematic to tie this inquiry to an objective standard because

> [a] reasonably prudent person would not rely almost entirely upon gambling and speculative investments as a basis for a promise to satisfy short term credit obligations. A reasonable person in the Debtor's circumstances would not have believed that he could continue to pay substantial credit card debts forever. Such a person would have realized that sooner or later he would lose enough to render him unable to pay those debts. *But it is less clear that the Debtor had an actual intent to deceive.*

*Murphy,* 190 B.R. at 333. (Emphasis added.)

Again, the answer is provided by reference to the common law principles of "actual fraud." The Restatement (Second) of Torts § 526 indicates that an objective "reasonable person" standard is inappropriate when ascertaining fraudulent intent. One of the comments to § 526 states that the issue is not whether a person "of ordinary care and intelligence" would have recognized the statement as false, but whether the *person making the statement* (in this case the debtor) was aware of the falsity. *See* Restatement (Second) of Torts § 526 cmt. d; *Murphy,* 190 B.R. at 333. Wisconsin law also appears to reject an objective standard. *See*

*Volk v. McCormick,* 41 Wis.2d 654, 659, 165 N.W.2d 185 (1969) (the standard "that in the exercise of reasonable diligence [the defendant] should have known of the falsity" is insufficient to constitute a fraudulent misrepresentation). Thus, although the reasonableness of the debtors' belief as to the truth of their representations may be circumstantial evidence of their intent, ultimately the issue is their *actual* intent and not the objective reasonableness of it. *Murphy,* 190 B.R. at 333; *see also Alvi,* 191 B.R. at 733 (objective ability to pay is not the issue). Hindsight, as they say, has twenty-twenty vision, but that is not the standard by which debtors are judged. A debtor may honestly, if mistakenly, believe he can repay a debt without falling prey to the penalties found in § 523(a)(2)(A). *Alvi,* 191 B.R. at 733.

Of course, even a subjective determination of intent requires an examination of all the circumstances. *Murphy,* 190 B.R. at 333. However, the debtor's subsequent failure to pay is "clearly insufficient" to prove an intent to deceive; this demonstrates only a breach of contract, not fraud. *Id.* Mere inability to pay is not the criteria for determining the debtor's intent, although it may be an "indicia" of fraudulent intent. *Ford,* 186 B.R. at 320. Instead, the Court must examine all of the circumstantial evidence available and formulate a conclusion regarding the debtors' intent. At this point, the Court could recite *Dougherty*'s twelve factors (or, for that matter, the ten factors listed in *Ford, supra,* or the six in *Pursley,* 158 B.R. at 668), and try to stretch and pull these debtors to fit the canvas of existing case law. But that the Court will not do. It cannot be doubted that it is often instructive to know how other courts have considered similar cases, and such insights may often illuminate the present case. Insight, however, is often lost in rote application of listed factors when the inquiry should be driven by the evidence at hand. Despite the many warnings that these factors are "non-exclusive," *see Eashai,* 167 B.R. at 184, the truth is that by copying such lists courts may limit their investigation to a review of the items on the list. As a result, the circumstances of the particular case are clouded, if not ignored

outright. *Murphy,* 190 B.R. at 334; *see also Alvi,* 191 B.R. at 733.

The debtors in this case deserve to have their testimony considered in light of their particular circumstances, not by reference to some chart of how many days it took to incur the challenged debts or whether they talked to an attorney before they incurred the debt. All of that may be relevant, and certainly may be considered as circumstantial evidence from which their intent may be ascertained. However, the Court will not limit the inquiry to the factors of any "list." The issue is whether the debtors acted with fraudulent intent, and that involves more than mechanical application of objective factors. It involves a determination of their credibility. *Alvi,* 191 B.R. at 734.

In this case, Mrs. Briese received a "pre-approved" credit card from the plaintiff. She used it to fund her gambling habit. She testified she was unaware of her overall financial situation until she won nearly $33,-000.00 and sat down to calculate her debts. Only then did she realize the hole she had dug for herself and her family. After payment of income taxes, a few bills and a few small improvements to their house (a modest home undoubtedly bursting at the seams given the presence of two adults and five children), she had $15,000.00 left. In the throes of her addiction, she returned to the casino looking to ride her "roll" a little longer. Unfortunately, she only added to her losses, and ultimately found it necessary to file bankruptcy.

The Court finds that she did not act with an intent to deceive the plaintiff when she obtained the cash advances. The fact that she subsequently lost all that she had won is not evidence of fraudulent intent; it only evidences the drug-like power of gambling upon certain people. Mrs. Briese herself testified that she felt she was on a "roll" because casino employees told her no one had ever won two large pots in 48 hours before. She testified that she hoped to win enough to pay off her debts. She had won some smaller jackpots previously, and she did manage to keep making her monthly payments until the bankruptcy filing. All of this indicates that she had an intent to pay

which, although perhaps not objectively reasonable to the "average" person, was nonetheless understandable given her mental state.

■ The Court recognizes the case law which would deny the debtors a discharge in this case simply because the money was spent gambling. *See, e.g., In re Clagg,* 150 B.R. 697 (Bankr.C.D.Ill.1993); *In re Vermillion,* 136 B.R. 225 (Bankr.W.D.Mo.1992); *In re Bartlett,* 128 B.R. 775 (Bankr.W.D.Mo. 1991); *In re Karelin,* 109 B.R. 943 (9th Cir. BAP 1990). In *Clagg,* the court recognized that "there is no basis for treating a debt that arose from legal gambling activities any differently from other debts legally incurred." 150 B.R. at 698. At the same time, the court rejected the debtor's hope that he would "win the big one" on the stated grounds that "[m]ere hope, or unrealistic or speculative sources of income, are insufficient" to demonstrate an ability to repay. *Id.* However, under the common law approach to the issue suggested by *Field,* it is the debtor's *subjective* intent which is critical. Section 523(a)(2)(A) was not intended to deny discharge to "debtors who made significant, albeit patently unreasonable, financial miscalculations," nor did Congress single out gambling debts for any particular punishment. *Alvi,* 191 B.R. at 734 n. 19. A debtor who honestly believes that gambling will create the necessary income to pay his debts lacks the "scienter" required for a debt to be nondischargeable on the basis of fraud. *Id.; see also In re Landen,* 95 B.R. 826 (Bankr. M.D.Fla.1989).

In this case, Mrs. Briese had an honest, if questionable and undoubtedly foolish, belief that she could win enough to pay her debts. She paid her bills and maintained the minimum payments on her credit cards until the day she filed bankruptcy. She had no intention of filing bankruptcy when she incurred the charges, and did not even realize the depths of her problem until she sat down to calculate how much of her casino winnings were needed to pay off her credit cards. She did not operate in "reckless indifference" to her financial state. Rather, she acted as many gamblers do—in truth, as many consumers do, whether they file bankruptcy or

not. She thought she was better off than she actually was; she miscalculated her financial condition. The simple fact that many would consider her foolish, or that she made significant "financial miscalculations," does not make her guilty of fraud. *Alvi,* 191 B.R. at 734. Thus, the plaintiff has failed to prove an essential element of its . action under § 523(a)(2)(A)—fraudulent intent—and the claim must fail.

■ Additionally, the claim must fail because the plaintiff has failed to demonstrate justifiable reliance upon the debtors' alleged misrepresentations. The "representation," of course, is the debtors' promise of future payment inherent in the use of the credit card. Section 523(a)(2)(A) requires that the plaintiff demonstrate reliance upon that representation, and the Supreme Court's decision in *Field* requires a showing that its reliance was "justifiable." —— U.S. at ——, 116 S.Ct. at 444, 133 L.Ed.2d at 362. The notion of "justifiable reliance" is to some extent intentionally vague. Much like the intent requirement, it is a subjective analysis which examines the particular plaintiff and the circumstances of the case, and does not judge the plaintiff under a "community standard of conduct." *Id.*

■ In this regard, the plaintiff may be justified in relying upon a representation of fact even though an investigation might have revealed the falsity of the statement; however, the plaintiff is also

> required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

*Id. (quoting* Restatement (Second) of Torts § 541 cmt. a). The Court must examine all of the facts available to the plaintiff, a large and sophisticated corporation, and determine whether the plaintiff should have realized that there might be some problem in extending credit to the debtors in this case. *In re Willis,* 190 B.R. 866, 870 (Bankr.W.D.Mo. 1996).

■ In the present case, there is little likelihood that the plaintiff relied upon any

representation made by the debtors. The plaintiff chose to send a "pre-approved" solicitation to the debtors because they fit within its desired customer profile. After receiving their application, it conducted a credit check which revealed their large outstanding debts, including unsecured credit debts which totalled 66% of their annual income. The plaintiff knew they made little more than minimum payments; arguably, it knew that they were financially *incapable* of making payments any larger than the minimum amount. The plaintiff relied upon this investigation in extending the debtors a sizeable credit allotment, and in permitting the continued use of the card. The debtors' actions or representations were largely irrelevant to the plaintiff's chosen course of action. Unintentional and wholly immaterial misrepresentations which have no effect on a creditor's decision are not a bar to discharge. *Field,* —— U.S. at ——– ——, 116 S.Ct. at 442–43, 133 L.Ed.2d at 360–61.

Further, even presupposing the plaintiff relied upon the debtors' representations, there is no doubt that its reliance was unjustified. It is clear that the plaintiff made an examination of the debtors' finances which indicated a high debt load and an inability to make more than minimum payments. This indicates that the plaintiff knew it was unlikely the debtors could ever pay a large account balance in full. The plaintiff chose to blindly ignore those warning signs and proceeded to extend credit to the debtors when, by Mrs. Briese's own account, other lenders had refused to do so. *Field* teaches that the court should examine the plaintiff's individual capacity and "the knowledge which he has." —— U.S. at ——, 116 S.Ct. at 444, 133 L.Ed.2d at 363. A plaintiff may not recover for fraud if he ignores a known or obvious risk. *Mayer,* 51 F.3d at 676. The plaintiff ignored an obvious risk in

extending credit to the debtors, and cannot now claim to have been "justified" in its reliance upon the debtors' representations. *Alvi,* 191 B.R. at 731.[17]

In this case, the plaintiff has failed to prove essential elements of an action under § 523(a)(2)(A)—namely, fraudulent intent and reliance. Accordingly, the plaintiff's complaint is dismissed. Costs are denied to both parties.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

---

**17.** The reasoning in *Field* and *Mayer* is superficially similar to the "assumption of the risk" theory which was rejected for its mechanical approach to the issue of credit card fraud. Both of these cases speak to the plaintiff's failure to attend to a known risk. *Field,* —— U.S. at ——, 116 S.Ct. at 444–45, 133 L.Ed.2d at 363; *Mayer,* 51 F.3d at 676. Although this sounds similar to the risks "assumed" by the creditor in *Roddenberry,* a close examination reveals that this comparison is inaccurate. The creditor is not defeated because of the assumption of a blanket risk (i.e., that some debtors will exceed their credit limits or otherwise act in a fraudulent manner) but because in the particular case the creditor chose to ignore a *known or obvious* risk. As the court in *Mayer* put it, "[e]ven a material lie may be disregarded when the victim is not actually taken in." *Id.*