DUHÉ, Circuit Judge,
joined by WIENER, DeMOSS, STEWART, and PARKER, Circuit Judges,
dissenting:
I am firmly convinced that the majority errs when it adopts the fiction that, as a matter of law, each separate use of a pre-approved credit card constitutes a representation by the user of an intent to pay, and that, if it does, the credit card issuer may rely on those representations. I, therefore, respectfully dissent for the reasons set forth in the panel opinion, AT&T v. Mercer (In re Mercer), 211 F.3d 214 (5th Cir.2000), and the following reasons. Mindful that dissents do little more than make the dissenter feel better, I shall state my reasons briefly.
The majority admits that a creditor must prove every element of its claim of nondischargeability by a preponderance of the evidence. But the majority has completely ignored the universally accepted and fundamental principle of bankruptcy law that exceptions to discharge must be narrowly construed in favor of the debtor. See, for example, Miller v. J.D. Abrams *426 Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir.1998). The majority’s omission effectively shifts the burden of proof and alters “ ‘the balance of bankruptcy policy struck by section 523’ ”. Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 448 (Bankr.W.D.Wis.1996) (quoting Chase Manhattan Bank, N.A. v. Ford (In re Ford), 186 B.R. 312, 317 (Bankr.N.D.Ga. 1995)) (“To permit credit card plaintiffs to benefit from ‘implications’ is to engage in impermissible burden-shifting.”) Briese, 196 B.R. at 449. If one can “infer” a representation from use of the card, then the creditor is relieved of the obligation of proving that a false representation was made.
The majority also ignores a second universally accepted canon of construction: contracts should be construed so as to avoid neutralizing or ignoring any provisions or treating provisions as surplusage. See, for example, Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 742 (5th Cir.1998). The majority construes Mercer’s credit agreement so as to neutralize completely its provisions obligating Mercer to repay AT&T for debts accumulated on the card.[1] Mercer represented in writing in the credit agreement, which she was required to accept before she used the card, that she intended to repay AT&T for credit extended through the card. The credit agreement embodied the entire agreement between Mercer and AT&T. Why, then, would Mercer undertake to represent each time she used her card that she intended to repay AT&T for its use? Though otherwise impressively thorough, the majority opinion does not answer this question. Indeed, the question cannot be answered because Mercer made no such representations. The majority’s less-than-benign fiction that she did has an unfortunate consequence: it allows AT&T effectively to rewrite the credit agreement after the fact. This is hardly the “narrow construction” the law requires. As rewritten through the majority’s legerdemain, moreover, the agreement between Mercer and AT&T clearly favors AT&T, since all agree that Mercer’s violation of the credit agreement’s requirement that she repay AT&T does not preclude discharge of her debt.
In my view, use of a credit card resembles the issuance of a check. The Supreme Court has held, as the majority admits, that issuing a check in payment of a debt knowing that the account on which the check is drawn does not contain sufficient funds to cover the check is not a representation that there are funds sufficient to cover the check. It is in fact not a representation of anything. Williams v. United States, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982) (“[T]ech-nically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as ‘true’ or ‘false’ ”). In Williams, the defendant engaged in a check kiting scheme during which he presented to several federally insured banks checks on his accounts that greatly exceeded the funds in those accounts. The Court held that by so doing, the defendant did not “make a false statement” because issuing the check was no statement at all. Id. The majority also discounts this holding because Williams was a criminal case and because a check simply orders funds to be transferred, but I fail to see how these facts impact Williams’s holding that issuing the check is not a representation. The majority also discounts Williams on the basis that in it the Court was applying the rule of lenity. A simple reading of the opinion shows, however, that the rule of lenity did not affect the rationale for the *427 holding, which the Court announced early in the opinion after thorough analysis. The Court in Williams only mentioned the rule of lenity in passing at the very end of the opinion after fully establishing the holding. If giving a check in payment of a debt is not a representation, then there is no justification in my view for holding, as the majority does, that using a credit card to obtain cash or make purchases is. This is particularly true in this case, where there was prior written representation of intent to repay. When a check is presented in payment of goods or services, or in exchange for cash, it simply authorizes the transfer of funds from the drawer’s account to the merchant. Likewise, when a credit card is presented for the same purposes, it simply authorizes a transfer of funds from the card-holder’s approved line of credit to the merchant, or to the cardholder in the case of the use of an ATM machine. Williams, therefore, applies here.
Interestingly, most of the courts that have adopted the implied representation theory have not considered Williams. AT&T Universal Card Servs. v. Alvi (In re Alvi), 191 B.R. 724, 732 (Bankr.N.D.Ill. 1996). The similarities between the issuance of a check and the use of a credit card make it illogical, I submit, to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a check does not.
The majority incorrectly characterizes the relationship between AT&T and Mercer as a series of loans — i.e., a loan made each time the card was used. The majority, accordingly, concludes that “[h]er promise to pay occurred not when the line was established, but at card-use, when the loan was made.” Opinion p. 406. This conclusion is simply incorrect. Her promise to pay occurred when Mercer accepted the written credit agreement with AT&T, which states that the card holder is “responsible for all amounts owed on [the card holder’s] [a]ccount ... and [the card holder] agree[s] to pay such amounts according to the terms of the [agreement.” AT&T conditioned its offer of credit to Mercer on her promise to accept the credit agreement and furnish certain information (annual income, social security number, birth date, home and business telephone numbers and her maiden name), which promise she kept. As I noted above, AT&T agreed with Mercer at that time upon all terms and conditions that would inform her use of the card. So what occurred when she used the card, therefore, was simply the transfer of funds against the credit line previously established and on the terms and conditions previously established. No new loan agreement was made and no new terms were agreed to. Hence, no new representations were made.
Although the panel opinion noted as much, this case implicates policy issues that, I think, merit another brief reference. AT&T offered Mercer a credit card and a $3,000 credit limit after conducting the cursory credit check described in the majority opinion on the condition that she return certain information, which she did, and that she accept the credit agreement, which she did. She was then free to use the card, subject to the terms and conditions of the agreement. Never did AT&T inquire about her prior credit card use, or the amount of her debt. Had it done so, Mercer’s lack of creditworthiness would have been obvious. Now AT&T asks this Court to fashion a fiction to save it from the consequences of its own inadequate credit check, and, to my surprise, this Court has done so. This action, in my view, subverts the requirement that the creditor prove each element of the exception to discharge upon which it relies and the bedrock principle that exceptions to *428 discharge must be narrowly construed in favor of the debtor.
Since I would hold that no implied representation was made, I would not reach the rebanee issue.

. In other words, to ignore the essence of the credit agreement.